## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MICHAEL A. CAMPBELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-13-926-R** |
| | ) | |
| **JODY JONES,** | ) | |
| **REBECCA MAKER, and** | ) | |
| **NADINE KELLOGG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Michael A. Campbell, appearing pro se, brings this action under 42 U.S.C. § 1983, alleging violations of his federal constitutional rights. United States District Judge David L. Russell has referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b). This matter is now before the Court on a dispositive motion filed by Defendants Jody Jones, Rebecca Maker, and Nadine Kellogg (Doc. No. 24).

## BACKGROUND

Mr. Campbell, who is currently incarcerated at the Oklahoma State Penitentiary in McAlester, Oklahoma, commenced this civil action on August 29, 2013, by filing a Complaint (Doc. No. 1), along with Exhibits (Doc. Nos. 1-1 to 1-3). On February 19, 2014, the Court dismissed without prejudice certain of Mr. Campbell's claims but also granted Mr. Campbell leave to file an amended complaint. Order, Doc. No. 15; *see also* Report & Recommendation, Doc. No. 14. On February 27, 2014, Mr. Campbell filed an

Amended Complaint (Doc. No. 16), largely limiting his claims to those that had not previously been dismissed, as discussed in more detail below. Mr. Campbell did not refile his pleading exhibits, but he incorporates the same by reference in his Amended Complaint.

In his Amended Complaint, Mr. Campbell names three Defendants in their official and individual capacities who are current or former employees of the Dick Conner Correctional Center ("DCCC"), a state-operated facility in Hominy, Oklahoma. *See* Am. Compl. at 1-2. These are: Jody Jones, the DCCC Medical Administrator; Rebecca Maker, a registered nurse; and Nadine Kellogg, a licensed practical nurse. *See id*.; Okla. Stat. tit. 57, § 509; *Dick Conner Correctional Center*, Okla. Dep't of Corr., http://www.ok.gov/doc/Organization/Field_Operations/East_Institutions/Dick_Conner_C orrectional_Center.html (last visited Mar. 23, 2015).

The claims of Mr. Campbell's three-count Amended Complaint[1] stem from events occurring from approximately December 30, 2012 through January 22, 2013, beginning with the alleged failure of one or more Defendants to replace Mr. Campbell's prescription blood pressure medication after it was lost in a flood at DCCC. Am. Compl. at 8-9. In

---

[1] In the "Jurisdiction" section of his Amended Complaint, Mr. Campbell refers to "pending jurisdiction relating to plaintiff's State claims." Am. Compl. at 4. In the "Exhaustion Statement" therein, Mr. Campbell references the Oklahoma Governmental Tort Claims Act. Am. Compl. at 5. The substantive sections of the Amended Complaint, however, include three counts which are all based on federal constitutional rights. Am. Compl. at 6-17. The Amended Complaint does not include any statements that specifically, or even liberally construed, assert claims under state law. Therefore, the undersigned construes the Amended Complaint as only asserting the three enumerated 42 U.S.C. § 1983 claims.

general, Mr. Campbell alleges that, despite his repeated requests for the medication and his deteriorating health, Defendants failed to provide medical care, causing Mr. Campbell to suffer a stroke that resulted in hospitalization and lasting injuries. *E.g.*, *id.* at 8-9. Mr. Campbell further alleges that, upon his return to DCCC after his hospitalization, one or more Defendants failed to adhere to his treating physician's instructions and for thirteen days failed to provide him with prescribed medications. *Id.* at 9-10. Finally, Mr. Campbell contends that his attempts to exhaust his administrative remedies in connection with these events led to Defendant Jones improperly placing Mr. Campbell on a twelve-month grievance restriction in March 2013. *See id.* at 16, 17; Compl. Ex. 17, Doc. No. 1-3, at 15.

In his request for relief, Mr. Campbell contends that he has suffered "substantial damage to the left hemisphere of [his] brain, paraly[sis,] and nerve damage." Am. Compl. at 20. Mr. Campbell seeks "declaratory and injunctive relief in the form of an order requiring the defendants to provide adequate medical care, and compensatory and punitive monetary damages in the amount of $2,000,000.00." Am. Compl. at 20. Mr. Campbell seeks this relief from "all defendants." Am. Compl. at 6.

Defendants have collectively moved to dismiss or, alternatively, for summary judgment (Defs.' Disp. Mot., Doc. No. 24). Mr. Campbell has responded to the motion (Pl.'s Resp., Doc. No. 27). Defendants filed no optional reply brief, and the time for filing such a brief has passed. Thus, the matter is ready for decision.

## ANALYSIS

In their collective motion, Defendants assert that Mr. Campbell has failed to state a claim upon which relief can be granted under 42 U.S.C. § 1983 for an Eighth Amendment violation and that Defendants are entitled to qualified immunity. *See* Defs.' Disp. Mot. at 16-22, 28-32. Defendants also contend that Mr. Campbell's claims are subject to dismissal because he failed to exhaust his administrative remedies before filing suit and because claims for money damages against Defendants in their official capacities are barred by sovereign immunity. *See id.* at 22-28.

The title of their motion notwithstanding, Defendants assert that their dispositive motion relies only upon documentary evidence that may properly be considered on a motion to dismiss, and expressly request that the "Court not convert [Defendants' dispositive] motion to a motion for summary judgment" based upon Defendants' reliance upon such documents. *See* Defs.' Disp. Mot. at 14-16. Further, Defendants do not present their dispositive motion in a manner consistent with Local Civil Rule 56.1(b), as would be required for a motion for summary judgment. That is, Defendants' motion does not contain the requisite "concise statement of material facts to which [Defendants] contend[] no genuine issue of fact exists"—a statement in which the facts must be numbered and which must "refer with particularity to those portions of the record upon which movant relies." *See* Defs.' Disp. Mot. at 8-14 (providing only a "Summary of Facts" that summarizes Mr. Campbell's allegations but which Defendants do not contend are undisputed).

Based on the above circumstances, the undersigned construes Defendants' dispositive motion strictly as a motion to dismiss and has declined to consider matters beyond the pleadings.[2]  *See* Fed. R. Civ. P. 12(b)(6); *see also* Fed. R. Civ. P. 12(d) (requiring conversion of motion to dismiss to one for summary judgment if court considers matters presented beyond the pleadings).

A. *Whether the Court Has Subject-Matter Jurisdiction over Official-Capacity Claims for Money Damages Under 42 U.S.C. § 1983 Against Defendants*

The Court previously dismissed Mr. Campbell's official-capacity claims against Defendants in his Complaint.  Order, Doc. No. 15.  Mr. Campbell reurges these claims against Defendants in his Amended Complaint.  *See* Am. Compl. at 1-2, 4, 6.  As discussed below, such claims seeking money damages cannot proceed because the Court lacks subject-matter jurisdiction over the claims.

In accordance with the doctrine of sovereign immunity, as adopted in the Eleventh Amendment, a federal court may not hear a claim brought by a private citizen against a U.S. state unless the state consents to suit or Congress unequivocally abrogates the state's immunity.  U.S. Const. amend. XI; *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996).  The State of Oklahoma has not waived Eleventh Amendment immunity

---

[2] To be clear, the undersigned has considered (1) the contents of the Amended Complaint; (2) the exhibits filed with the original Complaint, which Mr. Campbell references in his Amended Complaint; and (3) an ODOC policy that Mr. Campbell references in his Amended Complaint and that was filed as an exhibit to a Special Report without dispute as to its authenticity.  *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (listing types of evidence properly considered when analyzing the sufficiency of a pleading); Pl.'s Resp. to Defs.' Disp. Mot., Doc. No. 27; *see also* Defs.' Disp. Mot. at 15-16.

against § 1983 claims in federal court.  *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006).   Nor has Congress abrogated state immunity in any way pertinent to Mr. Campbell's § 1983 claims.  *See*, *e.g.*, *Quern v. Jordan*, 440 U.S. 332, 342, 345 (1979).

This immunity applies to any state agency that is considered "an arm of the state." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).   Whether an agency is an arm of the state is a question of federal law, but courts make this determination by analyzing the "nature of the entity created by state law."  *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) (internal quotation marks omitted).

Here, the relevant state agency is the Oklahoma Department of Corrections ("ODOC").   *See* Okla. Stat. tit. 57, §§ 502 (indicating ODOC has "jurisdiction and control" over state penal institutions), 509 (listing DCCC among state-operated facilities). The Tenth Circuit has stated that it considers the ODOC an arm of the State of Oklahoma.  *See Eastwood v. Dep't of Corr. of State of Okla.*, 846 F.2d 627, 631-32 (10th Cir. 1988) (concluding, in accordance with party's concession, that ODOC was entitled to Eleventh Amendment immunity as an arm of the state).   ODOC's powers and budgetary responsibilities further establish that it is an arm of the State of Oklahoma. *See, e.g.*, Okla. Stat. tit. 57, §§ 502-504, 505-508, 509, 510; Okla. Stat. tit. 62, §§ 34.42, 34.50-.52, 34.57; *see also Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765-66 (2002).

Defendants, as employees of the DCCC, are protected by Eleventh Amendment immunity in their official capacities to the extent money damages are sought.[3] A suit seeking recovery of money damages from a state official in his or her official capacity is the equivalent of a suit against the state itself. *See Edelman*, 415 U.S. at 663 (recognizing application of Eleventh Amendment immunity to official-capacity claim for money damages against state official). Thus, to the extent that Defendants' dispositive motion seeks dismissal of Mr. Campbell's claims for money damages against Defendants in their official capacities, Defendants' motion should be granted because, based on Defendants' noted immunity, the Court lacks subject-matter jurisdiction over such claims. *See* Defs.' Disp. Mot. at 27-28; Fed. R. Civ. P. 12(b)(1), 12(h)(3) (requiring dismissal "at any time" subject-matter jurisdiction is lacking).[4]

---

[3] The DCCC, as an institution operated by the ODOC, shares in the ODOC's Eleventh Amendment immunity. *See Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1113 (10th Cir. 2007) (citing *Edelman* and *Eastwood* in holding that Oklahoma State Penitentiary, an institution operated by the ODOC, was shielded by Eleventh Amendment immunity); *see also* Okla. Stat. tit. 57, §§ 502, 509.

[4] To state a claim for relief under 42 U.S.C. § 1983, as discussed below, a plaintiff must allege that the violation of a federal right that is the subject of the claim "was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "[A]n entity with Eleventh Amendment immunity is not a 'person' within the meaning of § 1983" and, accordingly, is "not subject to suit under § 1983 in either federal court or state court." *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 365 (1990) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)). Thus, the undersigned's recommendation regarding the extent of Defendants' Eleventh Amendment immunity would mean, by extension, that Plaintiff's claims seeking monetary relief from Defendants in their official capacities *also* should be dismissed for failure to state a claim because Defendants do not satisfy the "person" requirement of § 1983.

*B. Whether Mr. Campbell Has Stated an Individual-Capacity Claim Upon Which Relief May Be Granted Under 42 U.S.C. § 1983 for an Eighth Amendment Violation*

Defendants have moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Mr. Campbell's individual-capacity claims against them, asserting that Mr. Campbell has failed to state a claim upon which relief may be granted under 42 U.S.C. § 1983 for an Eighth Amendment violation. *See* Defs.' Disp. Mot. at 8, 13, 16-22 (citing Fed. R. Civ. P. 12(b)(6)).

1. Standard for Dismissal Under Federal Rule of Civil Procedure 12(b)(6)

Although the Court construes a pro se litigant's pleadings liberally, no litigant is exempt from compliance with or the consequences of applicable procedural rules. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). Such rules require a plaintiff's complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint fails to state such a claim when it lacks factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (footnote and citation omitted). Bare legal conclusions in a complaint, however, are not assumed to be true; legal conclusions "must be supported by factual allegations" to state a claim upon which relief may be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"[A] pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine

whether he makes out a claim on which relief can be granted." *Hall*, 935 F.2d at 1110; *see also Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (noting that although courts construe pro se pleadings liberally, courts "will not supply additional factual allegations to round out a plaintiff's complaint"). Whether a complaint contains sufficient facts to avoid dismissal is context-specific and is determined through a court's application of "judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Gee v. Pacheco*, 627 F.3d 1178, 1184-85 (10th Cir. 2010) (discussing *Iqbal*).

2. <u>Stating an Individual-Capacity Claim Under 42 U.S.C. § 1983 for an Eighth Amendment Violation</u>

To state a claim upon which relief can be granted under 42 U.S.C. § 1983, a plaintiff must allege facts to show *both*: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

When a defendant is sued in his or her individual capacity under § 1983, the plaintiff must establish specific elements as to each defendant. First, the plaintiff must establish the defendant's "personal involvement or participation" in the alleged violation of a federal right. *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996); *see also Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976). Second, the plaintiff must establish a causal connection between the acts of that particular defendant and the alleged violation of a federal right. *See Iqbal*, 556 U.S. at 676; *Pahls v. Thomas*, 718 F.3d 1210, 1225-28 (10th Cir. 2013). Finally, the plaintiff must establish that the defendant acted

with the state of mind required for the alleged underlying federal rights violation. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986).

The above requirements also apply when a supervisor is alleged to be responsible for the misconduct of a subordinate. *See Schneider*, 717 F.3d at 767 (holding that § 1983 claim against supervisor cannot be premised on vicarious liability); *Iqbal*, 556 U.S. at 676-77; *see also Dodds v. Richardson*, 614 F.3d 1185, 1199 n.8 (10th Cir. 2010) (noting that elements of liability may overlap). To establish the supervisor's personal involvement, a plaintiff must show that the supervisor's own individual actions violated a federal right of the plaintiff, for example through the supervisor's specific direction of a subordinate employee's action or through the supervisor's promulgation, creation, implementation, or responsibility for the continuation of a policy that resulted in the violation. *See Iqbal*, 556 U.S. at 676-77; *Schneider*, 717 F.3d at 767-68; *Pahls*, 718 F.3d at 1225, 1226 (requiring plaintiff to "identify the specific polic[y] over which [a] particular defendant[] possessed responsibility and that led to the alleged constitutional violation"); *Dodds*, 614 F.3d at 1194, 1199. In this regard, it is not sufficient "merely to show [the] defendant was in charge of other state actors who actually committed the violation." *Dodds*, 614 F.3d at 1195 (internal quotation marks omitted). To establish causation—i.e., that a supervisor caused a violation of the plaintiff's federal rights—the plaintiff must establish that a subordinate of the defendant-supervisor violated the plaintiff's federal rights and that "the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause" such a violation. *See Schneider*, 717 F.3d at 768 (internal quotation marks omitted); *see also Dodds*, 614 F.3d

at 1195-96, 1198. Finally, to establish state of mind the plaintiff must show that the supervisor acted with certain requisite intent, the exact nature of which depends on the type of violation alleged but is no less than the state of mind required for the subordinate to commit the underlying violation. *See Schneider*, 717 F.3d at 769; *Daniels*, 474 U.S. at 330; *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014).

Through the Eighth Amendment's prohibition against cruel and unusual punishment, prisoners are protected against the "unnecessary and wanton infliction of pain," which includes "deliberate indifference to [their] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted). To state a claim for an Eighth Amendment violation based on such circumstances, a prisoner must allege facts to establish an objective component, as well as a subjective component as to each defendant. To meet the objective component, a plaintiff must allege facts to establish that the deprivation of rights is related to a serious medical need, i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted). For this analysis, the relevant question is "whether the alleged harm . . . is sufficiently serious," not "whether the symptoms displayed to the prison employee are sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). When the harm is alleged to have resulted from a delay in medical care, the harm must be "substantial," such as that resulting in a permanent disability or in substantial pain. *Al-Turki v. Robinson*, 762 F.3d

1188, 1193 (10th Cir. 2014); *see also Sealock*, 218 F.3d at 1210 ("[N]ot every twinge of pain suffered as the result of delay in medical care is actionable."); *Mata*, 427 F.3d at 753 (reiterating requirement for "significant, as opposed to trivial, suffering").

To meet the subjective component of a claim of deliberate indifference to a serious medical need, a plaintiff must allege facts to establish that the defendant "acted or failed to act despite his [or her] knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. The defendant's knowledge is a question of fact and may be established, among other ways, through inference from circumstantial evidence or "from the very fact that the risk was obvious." *Id.* Only the symptoms that were presented to the prison employee are considered—i.e., whether "the symptoms [were] such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it." *Mata*, 427 F.3d at 753; *see also Martinez v. Beggs*, 563 F.3d 1082, 1089-90 (10th Cir. 2009) (noting that defendant must have disregarded substantial risk of specific type of harm claimed by plaintiff). Denying or delaying a prisoner's access to medical professionals capable of assessing or treating the prisoner's condition can establish the subjective component, particularly when unnecessary pain or a worsened condition results. *See Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (citing *Sealock*, 218 F.3d at 1211); *Mata*, 427 F.3d at 755; *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).

3. <u>Factual Allegations in Amended Complaint</u>

Mr. Campbell presents the following factual allegations in his Amended Complaint and Exhibits, which are accepted as true for the purpose of assessing whether Mr. Campbell has stated a claim against Defendants for an Eighth Amendment violation.

Although these allegations may not ultimately be proven, the allegations presented below are from Mr. Campbell's perspective with reasonable inferences drawn in Mr. Campbell's favor for the limited purpose of this analysis. *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). Although Mr. Campbell divides his Amended Complaint into three counts, the factual allegations overlap among these counts, and thus, the undersigned presents the allegations without adhering to the pleading's format.

Upon his intake at DCCC in November 2009, he was diagnosed with high blood pressure and prescribed Lisinopril. Am. Compl. at 7-8. Mr. Campbell was permitted to keep this medication in his cell and take it "on a regular schedule as prescribed." *Id.* at 8. Mr. Campbell took his medication regularly. *Id.*

On December 30, 2012, Mr. Campbell's housing unit at DCCC "flooded with raw sewage and waste water." *Id.* DCCC staff members evacuated the housing unit, requiring Mr. Campbell to relocate to another unit without his personal property, "including medications." *Id.*

"[O]n December 31, 2012, [Mr. Campbell] went to Medical Services to let them know the situation and to request more of his necessary blood pressure medication." *Id.*

> Defendants Maker and Kellogg told plaintiff that he needed to submit a "Sick Call Request" and wait to have an appointment set to see a doctor, a process that routinely takes two weeks at DCCC. Plaintiff attempted to further explain the situation, asking only that more medication be issued to him on an emergency basis due to the circumstance, to no avail.

*Id.*

On January 1, 2013, Mr. Campbell returned to Medical Services after he "began experiencing blurred vision, dizziness, severe headaches and an overall sickly feeling." *Id.* Mr. Campbell informed Defendants Maker and Kellogg of his symptoms and requested his medication, but "once again [he was] sent away with nothing." *Id.*; Pl.'s Aff., Compl. Ex. 2, Doc. No. 1-2, at 2. On January 2, 2013, Mr. Campbell "again described the symptoms that he was experiencing to Defendants Maker and Kellogg." *Id.* Mr. Campbell also "again attempted to obtain his medication and was again turned away." Am. Compl. at 8; Pl.'s Aff., Doc. No. 1-2, at 2. Mr. Campbell then submitted a Request for Health Services, to request, among other things, his Lisinopril. Am. Compl. at 9; Compl. Ex. 1, Doc. No. 1-2, at 1. On January 3, 2013, Mr. Campbell returned to Medical Services, "inform[ing] Defendants Maker and Kellogg that his symptoms [were] growing increasingly worse[;] yet he was again denied access to necessary medical care." Am. Compl. at 9. "On January 4, 2013, [Mr. Campbell] went yet again to Medical Services, again advising Defendants Maker and Kellogg that his symptoms are worse than the day before and was again denied treatment or medication of any kind." *Id.*

Thus, Mr. Campbell visited Medical Services each day beginning on December 31, 2013, through January 4, 2013. Am. Compl. at 8-9; Pl.'s Aff., Doc. No. 1-2, at 2. Mr. Campbell experienced "symptoms of dizziness, chest pain, short spells of faintness and blurred vision, which he expressed . . . to Defendants Maker and Kellogg for several days." Am. Compl. at 11. With the exception of one unspecified day when Defendant Kellogg provided 30 milligrams of Lisinopril to Mr. Campbell, Defendants Maker and Kellogg "both refused to give [Mr. Campbell his] high blood pressure medication,"

"telling [Mr. Campbell] to submit a sick call slip."  Pl.'s Aff., Doc. No. 1-2, at 2; *see also* Am. Compl. at 16.  Mr. Campbell asserts, "[Defendants Maker and Kellogg] are very familiar with me & my prescribed medication, as their patient since 2009."[5]  Pl.'s Aff., Doc. No. 1-2, at 2.

Mr. Campbell's Request for Health Services, requesting his Lisinopril, was received in DCCC's Medical Unit on January 3, 2013, and a response from a DCCC medical staff member dated the same day states: "Meds Being Replaced."  Compl. Ex. 1, Doc. No. 1-2, at 1; *see also* Am. Compl. at 9.  Mr. Campbell received the response on the evening of January 4, 2013.  Am. Compl. at 9.

Mr. Campbell alleges that despite that response, his medication was not replaced by Defendants Maker and Kellogg.  *Id.*  Another DCCC inmate and friend of Mr. Campbell's, Brian Green, accompanied Mr. Campbell to Medical Services "on three different occasions when [Mr. Campbell] was sick and needed his medication" and waited outside of that unit for Mr. Campbell.  *See* Green Aff., Compl. Ex. 3, Doc. No. 1-2, at 4.  After each visit, Mr. Green observed Mr. Campbell to be "very angry because he needed his medicine and medical refused him medication."  *Id.*  An additional DCCC inmate, Joshua Goulsby, "witness[ed] [Mr. Campbell] attempting to get his medication" "during that week."  Goulsby Aff., Compl. Ex. 4, Doc. No. 1-2, at 5 (internal quotation marks omitted).  Mr. Goulsby noted that Defendants Maker and Kellogg "were very rude

---

[5] Mr. Campbell also states, "DCCC Medical staff [were] well aware of Plaintiffs medical condition as he worked as a medical orderly with them in 2010."  Am. Compl. at 15. However, it is unclear from this statement whether he worked directly with any Defendant.  *See id.*

to [Mr. Campbell] and refused him his high blood pressure medication, and demanded that [Mr. Campbell] leave and fill out a sick call slip and do not return without a pass." *Id.* (internal quotation marks omitted).

Mr. Green also observed a deterioration in Mr. Campbell's health around this time. *See* Green Aff., Doc. No. 1-2, at 4. Specifically, Mr. Green noticed that Mr. Campbell's "mouth was starting to twist to the right side of his face, and [Mr. Green] kept telling [Mr. Campbell] to wipe his mouth, because he kept drooling." *Id.* Mr. Green was "constantly having to pick up little things for [Mr. Campbell]." *Id.* These circumstances "really alarmed" Mr. Green, who knew Mr. Campbell to be "physically active" and a "very independent & strong willed person that does not like a lot help from others." *Id.* Mr. Green continues:

> On January 5, 2013, I wanted to tell the officer on duty to call medical for [Mr. Campbell], but [Mr. Campbell] instructed me not to because [he] said that would be useless, because he had [gone] to medical that day already and they talked very disrespectful[ly] to him and instructed him to submit another sick call slip, which he had already [done] earlier that week. On January 6, 2013, I had to physically help [Mr. Campbell] walk to his cell and when I tried to talk to him, he could not verbally speak.[ So,] I ran[] to get C.O. Gross. C.O. Gross checked [Mr. Campbell] out and called medical immediately, without hesitation. Medical came quickly, with a wheel chair and carted [Mr. Campbell] off to medical.

*Id.* (internal quotation marks omitted).

Mr. Campbell also alleges that on January 6, 2013, he "lost his ability to speak and the ability to move his right arm and his right leg." *See* Am. Compl. at 9; *see also* Pl.'s Aff., Doc. No. 1-2, at 2; Compl. Ex. 9, Doc. No. 1-2, at 16. At Medical Services, "an ambulance was summoned and [Mr. Campbell] was finally taken to [a hospital]." *Id.*

Mr. Campbell remained hospitalized until January 9, 2013, because he "suffered a stroke." *See id.*; *see also* Compl. Ex. 5, Doc. No. 1-2, at 6-8 (hospital discharge instructions reporting transient ischemic attack, which generally is less serious than a stroke). Mr. Campbell's treating physician at the hospital "assessed [Mr. Campbell] as being a 'Fall Risk' due to a failure of his nervous system and restricted extremity use, indicating, 'brain damage done to the left hemisphere of the brain.'" Am. Compl. at 9. Mr. Campbell states that he "had never experienced any difficulties as a result of his heart nor brain condition" before the above described circumstances of being without his medication. *See id.* at 8.

Upon discharge from the hospital, Mr. Campbell was prescribed multiple medications for daily use, including Metoprolol (a beta blocker), Lisinopril, Lipitor, aspirin, and hydrochlorothiazide. *See id.* at 9; Compl. Ex. 5, Doc. No. 1-2, at 8. Mr. Campbell states that his treating physician "forwarded instructions to DCCC Chief Health Services Administrator Jody Jones . . . to check [Mr. Campbell's] blood pressure daily & follow up with physician once a week for next three weeks." Am. Compl. at 9 (internal quotation marks omitted).

Mr. Campbell asserts, but does not present specific factual allegations in support, that on January 10, 2013, "Defendants Maker and Kellogg continued to exhibit deliberate indifference to [Mr. Campbell's] confirmed serious medical need." *Id.* Mr. Campbell states that he therefore "returned to his unit and sought assistance from his program facilitator," who "placed a call to Medical Services that described [Mr. Campbell's] complaints" to the nurse manager. *See id.* Mr. Campbell's program facilitator was

instructed "to send [Mr. Campbell] to Medical Services immediately." *Id.* Mr. Campbell does not clearly describe any further events that day at Medical Services.[6] *See id.*; Pl.'s Aff., Doc. No. 1-2, at 2.

On January 11, 2013, Mr. Campbell returned to Medical Services "to have his blood pressure checked, because he was suffering from terrible chest pains." Am. Compl. at 9. "Defendants Maker and Kellogg again refused him medical care." *Id.* Mr. Campbell returned to his unit where a correctional officer called Medical Services on Mr. Campbell's behalf and was instructed by the nurse manager to send Mr. Campbell to Medical Services. *See id.* at 9-10. Mr. Campbell "returned as ordered, but this time Defendants Maker and Kellogg literally screamed and hollered for [Mr. Campbell] to leave, return to his unit and fill out a sick call slip, and not to return until called by medical personnel." *Id.* at 10. A security officer then told Mr. Campbell that he would be placed in segregated confinement if he did not leave Medical Services. *Id.* Mr. Campbell explained that the nurse manager, through a correctional officer, had instructed Mr. Campbell to visit Medical Services. *Id.* The security officer responded that Mr. Campbell was not permitted to return to Medical Services unless escorted by an official from Mr. Campbell's unit or in possession of a "pass" for Medical Services. *Id.*

---

[6] In a Request to Staff dated January 14, 2013, and addressed to Mr. Campbell's program facilitator, Mr. Campbell states that on January 10th, Defendants Maker and Kellogg were "mean and disrespectfu[l]" to him and that they instructed him "to turn in a sick call." *See* Compl. Ex. 7, Doc. No. 1-2, at 11. Mr. Campbell then requests the name of the nurse manager that his program facilitator had spoken to that day. *See id.* It is unclear whether Defendants Maker and Kellogg were alleged to have so instructed Mr. Campbell during his initial visit or during a later visit to Medical Services that day. *See id.*

By January 22, 2013, Mr. Campbell had not received "any follow-up examination performed by any medical staff or receive[d] any of the medications that [his treating physician at the hospital] had prescribed." *Id.*; *see also* Compl. Ex. 11, Doc. No. 1-2, at 22-23 (seeking prescribed treatment, among other things, through Emergency Medical Grievance Report Form dated January 22, 2013). On that date, Mr. Campbell had a scheduled dentist appointment. Am. Compl. at 10. A nurse informed Mr. Campbell that his prescriptions "had been available since January 9, 2013," and "asked why [Mr. Campbell] had not been down there to pick them up before then." *Id.* Mr. Campbell explained that Defendants Maker and Kellogg, as well as the security officer, had instructed Mr. Campbell "not to return to Medical Services without a pass." *See id.* at 10, 17. The nurse was "very concerned" and provided the medications to Mr. Campbell, explaining that each day the medications were not used, Mr. Campbell "risked another stroke, heart attack or death." *Id.* at 10.

Mr. Campbell states that, before the above circumstances occurred, he experienced no "difficulties as a result of his . . . condition." *Id.* at 8. Mr. Campbell states that he "now regularly experiences nervous tics, spasms, bouts of forgetfulness, muscle twitches, dizziness." *See id.* at 12. Mr. Campbell also alleges that the brain damage he suffered has impeded his ability to complete forms properly when using his prison's grievance process. *See id.* at 5.

4. <u>Whether Mr. Campbell Has Stated a Claim upon Which Relief Can Be Granted for Deliberate Indifference to a Serious Medical Need</u>

Under the standards detailed above, and assuming the facts of Mr. Campbell's Amended Complaint to be true, the undersigned will consider whether Mr. Campbell has stated an individual-capacity claim upon which relief may be granted against Defendants Maker and Kellogg for deliberate indifference to Mr. Campbell's serious medical needs. The undersigned will then consider the same as to Defendant Jones.

a. Defendants Maker and Kellogg

Mr. Campbell has adequately pled the objective component of an Eighth Amendment claim. Mr. Campbell alleges that due to the delay in receiving his prescription blood pressure medication, he experienced symptoms of deteriorating health, including "blurred vision, dizziness, severe headaches and an overall sickly feeling," as well as "chest pain" and "short spells of faintness" over the course of several days. Am. Compl. at 8-9, 11. Mr. Campbell alleges that he then "lost his ability to speak and the ability to move his right arm and his right leg" and "suffered a stroke," causing "permanent and irreversible brain hemisphere damage." Am. Compl. at 9, 12. Mr. Campbell states that, as a result of a second (post-hospitalization) delay in receiving his prescription medication, he "suffer[ed] from terrible chest pains." *See* Am. Compl. at 9. As noted, Mr. Campbell states that, before the above circumstances occurred, he experienced no "difficulties as a result of his . . . condition" but "now regularly experiences nervous tics, spasms, bouts of forgetfulness, muscle twitches, dizziness." *See* Am. Compl. at 8, 12. Defendants generally offer no substantive dispute that Mr.

Campbell has alleged sufficient facts to state the objective prong of his claims against Defendants Maker and Kellogg.[7]  *See* Defs.' Disp. Mot. at 17-18.

The above allegations are sufficiently serious to state the objective component of an Eighth Amendment claim.  *See Mata*, 427 F.3d at 753.  That is, such allegations are indicative of "substantial" harm suffered by Mr. Campbell due to a delay in medical care, as well as a resultant permanent disability.  *See Al-Turki*, 762 F.3d at 1193.

Mr. Campbell has also established the subjective component of these claims.  Mr. Campbell asserts that Defendants Maker and Kellogg were familiar with Mr. Campbell and his prescriptions because Mr. Campbell had been their patient for over three years by the relevant time.  *See* Pl.'s Aff., Doc. No. 1-2, at 2.  Mr. Campbell alleges that he promptly requested replacement prescription blood pressure medication from Defendants Maker and Kellogg, who declined to issue the medication, even on an emergency basis, insisting instead that Mr. Campbell follow the routine process of seeking an appointment with a doctor.  *See* Am. Compl. at 8.  Mr. Campbell asserts that, by the next day, he began experiencing the symptoms discussed above—"blurred vision, dizziness, severe

---

[7] As to this point, Defendants state only:

> In this case, the factual nature of the objective component would not be appropriate to discuss in a motion to dismiss.  However Defendants contend that Plaintiff has not suffered any lifelong handicap, permanent loss, or considerable pain.  Still, Plaintiff alleges severe pain throughout the Amended Complaint, therefore the fact-intensive inquiry into the objective component would be more appropriately addressed at a later time, if necessary.  Defendants will assume without conceding, for the purposes of this Motion to Dismiss, that Plaintiff does establish the objective prong.

*See* Defs.' Disp. Mot. at 17-18.

headaches and an overall sickly feeling"—and reported those symptoms to Defendants Maker and Kellogg, who still declined to provide the medication. *Id.*; Pl.'s Aff., Compl. Ex. 2, Doc. No. 1-2, at 2. Mr. Campbell asserts that he repeated the process of requesting his prescription from and reporting his symptoms to Defendants Maker and Kellogg for at least three subsequent days. *See* Am. Compl. at 8-9; Pl.'s Aff., Compl. Ex. 2, Doc. No. 1-2, at 2. During this period, Mr. Campbell states that he obtained only one dose of the requested medication from Defendant Kellogg, despite reporting to Defendants Maker and Kellogg his "increasingly worse" symptoms, which at some point also included "chest pain." Am. Compl. at 9, 11. Mr. Campbell asserts that these Defendants steadfastly maintained that Mr. Campbell was required to "submit a sick call slip." *See* Pl.'s Aff., Doc. No. 1-2, at 2; *see also* Am. Compl. at 16. Mr. Campbell further asserts that after his hospitalization, he returned to Medical Services for doctor-ordered follow-up care and "because he was suffering from terrible chest pains," but these Defendants continued to insist that Mr. Campbell was not permitted any medical care without first submitting a sick call slip and subsequently being summoned by medical personnel. Am. Compl. at 9-10. Mr. Campbell contends that "[a]ny reasonable person can comprehend that high blood pressure conditions are serious." Am. Compl. at 11. Mr. Campbell further contends that Defendants Maker and Kellogg, as a registered nurse and a licensed practical nurse, respectively, "have clearly had the training necessary to understand the potential severity of the situation." *Id.*

In sum, Mr. Campbell alleges that Defendants Maker and Kellogg knew that (1) Mr. Campbell had been prescribed medication for high blood pressure; (2) Mr. Campbell

was without the medication; (3) Mr. Campbell was reporting symptoms that were consistent with a blood pressure condition; and (4) Mr. Campbell's symptoms were worsening.[8] From such allegations, it is reasonable to infer that Mr. Campbell faced a substantial risk of a serious adverse medical event, including a stroke, and that Defendants Maker and Kellogg knew of this risk based on either their medical training or the risk's obviousness. *See* Am. Compl. at 15-16; *Farmer*, 511 U.S. at 842. Despite such knowledge, Defendants Maker and Kellogg allegedly repeatedly declined to provide the prescribed medication or to take any other action in their roles as providers or gatekeepers to directly address this known risk. *See* Am. Compl. at 11-13. Such allegations are sufficient to establish that Defendants Maker and Kellogg recklessly disregarded a substantial risk, i.e., to establish the subjective component of Mr. Campbell's claims against these Defendants. *See Farmer*, 511 U.S. at 842; *Self*, 439 F.3d at 1231; *Mata*, 427 F.3d at 753, 755.

Thus, Mr. Campbell has plausibly stated each required component of an Eighth Amendment claim against Defendants Maker and Kellogg for exhibiting deliberate indifference to his serious medical needs. Accordingly, Defendants' Dispositive Motion should be denied to the extent that it seeks to dismiss these claims for failure to state a claim upon which relief may be granted.

---

[8] Further, from Mr. Campbell's own sworn statements in the Amended Complaint and an Affidavit, as well as the sworn statements of Mr. Green who witnessed Mr. Campbell's condition, there is some evidence that Mr. Campbell's deteriorating condition during the relevant period was outwardly apparent, for example Mr. Green's observation that Mr. Campbell's "mouth . . . starting to twist to the right side of his face," causing him to drool. *See* Green Aff., Doc. No. 1-2, at 4; Am. Compl. at 9; Pl.'s Aff., Doc. No. 1-2, at 2.

b.  Defendant Jones

Liberally construed, Mr. Campbell alleges that Defendant Jones exhibited deliberate indifference to his serious medical needs either directly or as a supervisor or both.  In general, Mr. Campbell asserts that Defendant Jones' responsibilities as DCCC's Chief Health Services Administrator required her to ensure that inmates had access to adequate medical care.  Am. Compl. at 17.  Mr. Campbell alleges that upon his discharge from the hospital on January 9, 2013, his treating physician "forwarded instructions to [Defendant] Jones . . . to check [Mr. Campbell's] blood pressure daily & follow up with physician once a week for next three weeks."  Am. Compl. at 9 (internal quotation marks omitted).  Mr. Campbell alleges that Defendant Jones "failed to ensure compliance with any of [the treating physician's] instructions."  Am. Compl. at 10, 17.  Mr. Campbell also alleges that "Defendant Jones had personal knowledge of [Mr. Campbell's] medical condition, as was her responsibility to know."  Am. Compl. at 17.

Assuming Mr. Campbell's allegations to be true, Defendant Jones knew of Mr. Campbell's hospitalization and associated medical needs as early as January 9, 2013, when the treating physician forwarded instructions to Defendant Jones.  *See* Am. Compl. at 9.  However, the Amended Complaint and Exhibits do not reflect that Defendant Jones had any knowledge regarding whether Mr. Campbell's medical needs were being met— or, more precisely, not being met—between the date of Mr. Campbell's return and the date he alleges he received his prescriptions (January 22, 2013).

For instance, on a Request to Staff dated January 10, 2013, and addressed to Defendant Jones, Mr. Campbell recounted the events preceding his hospitalization and

requested that Defendant Jones implement a policy to prevent DCCC nurses from refusing to provide prescribed blood pressure medication to inmates. *See* Compl. Ex. 9, Doc. No. 1-2, at 15-16. Mr. Campbell also requested that Defendant Maker's employment be terminated based on her allegedly improper treatment of Mr. Campbell. *Id.* at 15. Mr. Campbell does not indicate in the Request whether any post-hospitalization care, including prescriptions, had been denied to him or whether he was then experiencing any symptoms from his condition. *See id.* at 15-16. The Request reflects that it was not received in the DCCC Medical Unit until January 23, 2013, i.e., after Mr. Campbell received his prescriptions on January 22, 2013. *See id.*; Am. Compl. at 10. Defendant Jones returned the Request unanswered to Mr. Campbell on January 24, 2013, because "[r]equests for disciplinary action against staff will not be addressed." Compl. Ex. 9, Doc. No. 1-2, at 14. Other grievance-related documents that Mr. Campbell submitted to Defendant Jones are all dated after January 22, 2013, and contain no statement as to ongoing symptoms, i.e., he only describes past events and seeks the above stated policy change. *See, e.g.*, Compl. Ex. 13, Doc. No. 1-3, at 3; Compl. Ex. 15, Doc. No. 1-3, at 8-14; Compl. Ex. 17, Doc. No. 1-3, at 15.

Regardless of whether Mr. Campbell has established the objective component of his Eighth Amendment claim against Defendant Jones, Mr. Campbell has failed to allege sufficient facts to establish the subjective component of that claim. That is, Mr. Campbell has failed to establish that Defendant Jones had knowledge of Mr. Campbell's serious medical need, whether directly or as a supervisor, before the need had been addressed by other DCCC medical staff members.

In his Amended Complaint and Exhibits, Mr. Campbell never alleges that Defendant Jones had knowledge of an ongoing denial of care or that Mr. Campbell presented ongoing symptoms to Defendant Jones. *See* Am. Compl. at 1-2, 5, 9, 10, 16-17, 18. Even if Defendant Jones received instructions from Mr. Campbell's treating physician, there are no allegations that Defendant Jones was personally required to provide the medical care in those instructions or that Defendant Jones had knowledge that such care was not being provided. *See id.* Mr. Campbell's assertion that Defendant Jones had a "responsibility to know" about Mr. Campbell's medical condition is insufficient to establish the requisite mental state for an Eighth Amendment claim. *See* Am. Compl. at 17; *Farmer*, 511 U.S. at 837. That is, without *actual* knowledge of Mr. Campbell's asserted serious medical need for post-hospitalization care, Defendant Jones cannot be said to have exhibited deliberate indifference to that need. *See Farmer*, 511 U.S. at 837.

Thus, because Mr. Campbell has failed to establish the subjective component of this claim against Defendant Jones, Defendants' Dispositive Motion should be granted to the extent that it seeks to dismiss the claim for failure to state a claim upon which relief can be granted.

C. *Whether Defendants Are Entitled to Qualified Immunity from Individual-Capacity Claims for Eighth Amendment Violations*

Defendants contend that they are entitled to qualified immunity in their individual capacities from claims alleging Eighth Amendment violations because either (1) Mr. Campbell has not sufficiently alleged such a violation; or (2) Defendants' conduct was

objectively reasonable, even if in violation of the Eighth Amendment.  *See* Defs.'s Disp. Mot. at 28-31.  Because the undersigned has already recommended dismissal of the individual-capacity Eighth Amendment claim against Defendant Jones, as discussed above, the undersigned considers only whether Defendants Maker and Kellogg are entitled to qualified immunity from such claims against them.[9]

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  This doctrine is intended "to shield officials from harassment, distraction, and liability when they perform their duties reasonably," while ensuring that such officials who "exercise power irresponsibly" are held accountable.  *Id.*

When qualified immunity is asserted in the context of a motion to dismiss, the factual allegations of the complaint are assumed to be true, and the court's analysis generally aligns with the analysis applied when determining the sufficiency of a claim.  *See Iqbal*, 556 U.S. at 666, 673-75, 677-84; *Brown v. Montoya*, 662 F.3d 1152, 1162-64 (10th Cir. 2011).  The court analyzes a defendant's entitlement to qualified immunity through a two-pronged inquiry in which either prong may be considered first.  *See Pearson*, 555 U.S. at 236; *Brown*, 662 F.3d at 1164.  Specifically, the court considers (1)

---

[9] Further, Defendants appear to raise qualified immunity only as to the individual-capacity Eighth Amendment claims against Defendants Maker and Kellogg.  *See* Defs.' Disp. Mot. at 28-31.

"whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citations omitted).

As to the first prong, the undersigned has already found above that Mr. Campbell has alleged sufficient facts to establish that Defendants Maker and Kellogg violated his Eighth Amendment right to be free from deliberate indifference to his serious medical needs. *See supra* Part II.B.4.a. As to the second prong:

> It has been clearly established in this circuit since at least 2006 that a deliberate indifference claim will arise when "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, e.g., a patient complains of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell."

*Al-Turki*, 762 F.3d at 1194 (quoting *Self*, 439 F.3d at 1232); *see also Estelle*, 429 U.S. at 104 (establishing in 1976 that deliberate indifference to serious medical needs in prison violates the Eighth Amendment); Defs.' Disp. Mot. at 29 (conceding that Mr. Campbell has "clearly established right to be free from deliberate indifference to his serious medical needs"). Mr. Campbell's allegations involving Defendants Maker's and Kellogg's conduct as medical professionals in 2013 fall within the conduct described in *Al-Turki* and *Self*, i.e., conduct that has clearly been established as in violation of the Eighth Amendment since 2006.

Defendants Maker and Kellogg contend that even in such circumstances, they are nevertheless entitled to qualified immunity because their conduct, as alleged by Mr. Campbell, was objectively reasonable because it was based upon an ODOC policy and

procedures manual, Access to Health Care OP-140117. *See* Defs.' Disp. Mot. at 30-31.

Specifically, Defendants contend that their alleged actions of repeatedly demanding that

Mr. Campbell submit a Request for Health Services (or "sick call slip") before any

medical services would be provided were actions in accordance with OP-140117. *Id.*

(citing "SR at 49," i.e., OP-140117 § III.C, Special Report Ex. 6, Doc. No. 23-6, at 5).[10]

Defendants contend that although conduct adhering to such a policy "may not render the

conduct reasonable per se, [it is] a factor which militates in favor of the conclusion that a

reasonable official would find that conduct constitutional." *Id.* (internal quotation marks

omitted).

Objective reasonableness is a narrow defense, reserved to extraordinary

circumstances, and "measured by reference to the clearly established law." *Harlow*, 457

U.S. at 818.

> Usually, if the law was clearly established at the time of the relevant
> events, the qualified immunity defense will fail. "Nevertheless, if the
> official pleading the defense claims extraordinary circumstances and can
> prove that he neither knew nor should have known of the relevant legal
> standard, the defense should be sustained." Exceptional circumstances
> which may render an official's conduct objectively reasonable and therefore
> justify qualified immunity include reliance on a state statute or regulation
> and reliance on the advice of legal counsel. It is the defendant's burden to
> claim such extraordinary circumstances and prove that his conduct was
> objectively reasonable.

---

[10] It is unclear whether the version of OP-140117 that was filed as Exhibit 6 to the
Special Report is the precise version of the policy that was in effect at the time relevant to
Mr. Campbell's factual allegations, i.e. in December 2012 through January 2013. *See*
OP-140117, Special Report Ex. 6, at 1 (reflecting an effective dates of November 28,
2012, with revisions effective July 8, 2014).

*Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 842 (10th Cir. 2005) (citations omitted) (quoting *Harlow*, 457 U.S. at 819).

Defendants have not established that such extraordinary circumstances are reflected in the Amended Complaint, as would be required for dismissal based on qualified immunity at this point in the proceedings. First, OP-140117 does not require that a Request for Health Services form be submitted in all circumstances. *See* OP-140117 § III.C, Special Report Ex. 6 at 5. For instance, the "form is not required when an offender returns to a clinic to receive medical . . . follow-up treatment that was previously recommended by a healthcare provider," such as Mr. Campbell alleges that he returned to Medical Services to receive after his hospitalization. *See id.* § III.C.2; Am. Compl. at 9-10. Also, although such forms are evaluated to determine whether a request involves an emergent need, there is no express requirement that a form be submitted during an emergency. *See* OP-140117 § III.C. Viewing the facts alleged by Mr. Campbell as true, Defendants' repeated demands that Mr. Campbell submit such a form before receiving services, despite the alleged deterioration in his health, were not actions so clearly required by OP-140117 as to permit dismissal. That is, even if adherence to OP-140117 could provide the exceptional circumstances required for a legal finding of objective reasonableness in light of the clearly established law, the question of whether Defendants' actions were required by that policy has not been established at this point in the proceedings and under the governing standard of review.

Moreover, OP-140117 indicates that emergency situations are governed by a separate policy, Emergency Care OP-140118, which Mr. Campbell cites in his Amended

Complaint as the relevant policy under which Defendants Maker and Kellogg should have acted. *See* Am. Compl. at 13. Defendants do not address this assertion, *see* Defs.' Disp. Mot. at 30-31, and no copy of OP-140118 was filed with the Special Report.

In sum, Defendants Maker and Kellogg have failed to meet their burden of establishing that it is clear from the Amended Complaint that their conduct was objectively reasonable in light of the clearly established law in *Self* and *Estelle*. *See Mimics, Inc.*, 394 F.3d at 842. Accordingly, Defendants' Dispositive Motion should be denied to the extent that Defendants Maker and Kellogg contend that they are entitled to qualified immunity from Mr. Campbell's Eighth Amendment claims against them in their individual capacities.

### D. Whether Mr. Campbell's Amended Complaint Is Subject to Dismissal Under 42 U.S.C. § 1997e(a) for Failure to Exhaust Administrative Remedies

A prisoner may not bring a suit under 42 U.S.C. § 1983 regarding prison conditions until he or she has properly exhausted *available* administrative remedies. *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 90, 93-103 (2006); *see also Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010) ("Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust."). A prisoner-plaintiff is not required to affirmatively plead his or her exhaustion of available administrative remedies. *Jones*, 549 U.S. at 216. A defendant's assertion that a prisoner-plaintiff has failed to exhaust such remedies is an affirmative defense for which the defendant bears the burden and for which dismissal may be granted only when the

defense appears clear from the pleading.  *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007); *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965).

Defendants contend that Mr. Campbell's failure to exhaust his administrative remedies is apparent from the pleadings, including the exhibits filed with the original Complaint, which are incorporated into the Amended Complaint by reference.  *See* Defs.' Disp. Mot. at 16, 23-27.  For the reasons noted below, among others, the undersigned concludes that Defendants have failed to satisfy their burden as to this affirmative defense and that Mr. Campbell has sufficiently alleged, although not required to do so, that any failure to exhaust administrative remedies was due to the unavailability of such remedies.

Defendants contend that Mr. Campbell "never filed any appeals on any of the grievances" he submitted, as is required to exhaust administrative remedies in accordance with ODOC's grievance procedures.  *See* Defs.' Disp. Mot. at 24, 26.  However, Defendants cite no source for this alleged failure and cannot definitively establish their contention based on the pleadings alone, which do not directly address the appeal process other than to assert generally that available remedies were exhausted.  *See* Defs.' Disp. Mot. at 26; Am. Compl. at 5, 6.  Additionally, on at least one occasion, Mr. Campbell's Request for Health Services was granted but the medication ordered was allegedly not provided promptly.  *See* Compl. Ex. 1, Doc. No. 1-2, at 1 ("Meds Being Replaced").  Defendants do not address how or why an appeal in such circumstances would be required.  *See* Defs.' Disp. Mot. at 25-26.

Further, in his Amended Complaint, Mr. Campbell provides multiple reasons as to why administrative remedies were unavailable to him, including an allegation that Defendant Jones intentionally thwarted his attempts to complete the process properly—an allegation that finds some support in Mr. Campbell's documentary evidence, which he incorporates by reference. *See, e.g.*, Am. Compl. at 5, 6, 16-17; Compl. Ex. 9, Doc. No. 1-2, at 14-16; Compl. Exs. Doc. No. 1-3, at 4-7, 8-14, 15, 1-3. Accepting Mr. Campbell's factual allegations as true and having reviewed the relevant incorporated evidence, the undersigned finds that Mr. Campbell has sufficiently alleged that certain remedies were made unavailable to him through Defendant Jones' conduct, even though he is not required to affirmatively plead such allegations.

At a minimum, Mr. Campbell's allegations and exhibits indicate that he has adequately pled exhaustion or excuse therefrom, and Defendants' arguments to the contrary cannot be resolved on a motion to dismiss. *Cf. Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010) (emphasizing that "that district courts are 'obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials' before dismissing a claim for failure to exhaust" (quoting *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)). Thus, the undersigned finds that resolution of whether Mr. Campbell has exhausted his available administrative remedies is not appropriate on the current record. Accordingly, the undersigned recommends that Defendants' Dispositive Motion be denied to the extent that Defendants seek dismissal of the Amended Complaint based on Mr. Campbell's alleged failure to exhaust his administrative remedies.

*E. Whether Any of Mr. Campbell's Claims That Are Unaddressed by Defendants' Dispositive Motion Should Be Dismissed*

In addition to considering the contentions set forth in Defendants' Dispositive Motion, the Court is also required to evaluate the sufficiency of any complaint brought by a prisoner with respect to prison conditions or who is seeking redress against a governmental entity, officer, or employee. *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. § 1915A(a). The Court is required to dismiss a complaint or any portion of a complaint that fails to state a claim upon which relief may be granted. *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. § 1915A(b)(1). The standard of review for such screening is the same as that applied when considering a motion to dismiss for failure to state a claim upon which relief may be granted, which is detailed above. *See Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007). Further, the Court is required to dismiss any claim for which the Court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

Mr. Campbell at least nominally presents claims in his Amended Complaint that Defendants do not address in their Dispositive Motion: (1) that, due to ongoing inadequacies, Mr. Campbell is entitled to prospective declaratory and injunctive relief ordering Defendants to provide adequate medical care, *see* Am. Compl. at 12, 20; and (2) that Defendants Kellogg and Jones in their individual capacities violated Mr. Campbell's rights under the Fourteenth Amendment, *see* Am. Compl. at 15, 16.

1. Ongoing Medical Care Inadequacies

The Court previously dismissed Mr. Campbell's claim regarding allegedly ongoing inadequate medical care due to Mr. Campbell's failure to state a claim upon

which relief may be granted. Order, Doc. No. 15. Mr. Campbell was advised by the undersigned that it was possible to cure the deficiencies in that claim by providing additional factual allegations in an amended complaint, and the Court granted Mr. Campbell leave to file such a complaint. Report & Recommendation, Doc. No. 14, at 18-19; Order, Doc. No. 15, at 2. Although Mr. Campbell filed an Amended Complaint, he provided no additional factual allegations in support of that dismissed claim and, thus, he has again failed to state a claim upon which relief may be granted. *Compare* Compl. at 13, 22, *with* Am. Compl. at 12, 20. *See also* Report & Recommendation, Doc. No. 14, 9-12. Moreover, Mr. Campbell is no longer incarcerated at DCCC, rendering moot any claim for prospective relief against Defendants at that facility. *See* Notices of Change of Address, Doc. Nos. 20, 32 (reflecting that Mr. Campbell is currently incarcerated at Oklahoma State Penitentiary); *Jordan v. Sosa*, 654 F.3d 1012, 1023, 1027-28 (10th Cir. 2011).[11] Accordingly, the undersigned recommends that Mr. Campbell's claim seeking prospective declaratory and injunctive relief be dismissed. *See* Fed. R. Civ. P. 12(h)(3); *Jordan*, 654 F.3d at 1023, 1027-28 (noting mootness of claim deprives court of subject-matter jurisdiction).

---

[11] When an ongoing violation is alleged to involve a policy "throughout a prison system" the claim may not be rendered moot by a transfer away from a particular facility. *See Jordan*, 654 F.3d at 1028-29. However, Mr. Campbell's allegations do not involve any such policy and, instead, involve only the conditions at DCCC. *See* Am. Compl. at 12, 22.

2. Individual-Capacity Fourteenth Amendment Claims Against Defendants Kellogg and Jones

Mr. Campbell cites the Eighth and Fourteenth Amendments in certain claims against Defendants Kellogg and Jones. *See* Am. Compl. at 15, 16. In citing the Fourteenth Amendment, Mr. Campbell may simply be referring to the fact that the Eighth Amendment applies to the states through the Fourteenth Amendment. *See Rhodes v. Chapman*, 452 U.S. 337, 344-45 (1981). Mr. Campbell does not specifically cite a particular right under the Fourteenth Amendment in connection with these claims and does not present factual allegations that clearly indicate a violation of the Fourteenth Amendment that would be due consideration independent of Mr. Campbell's Eighth Amendment claims.

To the extent that Mr. Campbell is alleging a substantive due process violation in connection with the assertion that Defendants Kellogg and Jones exhibited deliberate indifference to Mr. Campbell's serious medical needs, such claims are and should only be analyzed under the Eighth Amendment, which, as interpreted, specifically requires prison officials to provide adequate medical care to avoid imposing cruel and unusual punishment on a prisoner. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 395 (1989) (noting that when a type of claim is covered by a specific constitutional provision, the standards for that provision must be used to analyze the claim rather than "the more generalized notion of 'substantive due process'"); *Estelle*, 429 U.S. at 104; *see also Cnty. of Sacramento*, 523 U.S. at 842-43; *Whitley*, 475 U.S. at 327. Thus, no separate Fourteenth Amendment substantive due process analysis is warranted.

As to Defendant Jones, Mr. Campbell also alleges interference with the grievance process and improper placement on a grievance restriction. *See* Am. Compl. at 5, 16, 17, 18. These allegations largely appear related to Mr. Campbell's discussion of his attempts to exhaust his administrative remedies. *See id.* Mr. Campbell does not otherwise identify any specific harm or consequence of Defendant Jones' alleged conduct. *See id.* To the extent that Mr. Campbell is alleging a Fourteenth Amendment procedural due process violation, such a claim based on inadequacies of the grievance process is not viable without, generally, accompanying allegations of harm due to denial of access to the courts in connection with an underlying constitutional violation as presented in the grievance—none of which Mr. Campbell alleges. *See id.*; *Walters v. Corr. Corp. of Am.*, 119 F. App'x 190, 191 (10th Cir. 2004) ("'When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance.'" (quoting *Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991))); *Rauh v. Ward*, 112 F. App'x 692, 693 (10th Cir. 2004) (same). Thus, to the extent alleged, any claim that Defendant Jones violated Mr. Campbell's procedural due process rights should be dismissed for failure to state a claim upon which relief may be granted. *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. § 1915A(b)(1).

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that Defendants' Dispositive Motion (Doc. No. 24) be granted in part and denied in part, as follows:

1. The Motion should be granted to the extent that it seeks dismissal of any official-capacity claims against Defendants for money damages;

2. The Motion should be granted to the extent that it seeks dismissal of any Eighth Amendment claim alleged against Defendant Jones in her individual capacity; and

3. The Motion should be denied to the extent that it seeks dismissal of any Eighth Amendment claims alleged against Defendants Maker and Kellogg in their individual capacities, and should be denied to the extent that these Defendants seek dismissal in their individual capacities on the basis of qualified immunity or for failure to exhaust available administrative remedies.

The undersigned further recommends that Mr. Campbell's claim in his Amended Complaint for prospective declaratory and injunctive relief against Defendants be dismissed as moot. Finally, the undersigned recommends that any individual-capacity claims under the Fourteenth Amendment against Defendants Kellogg and Jones in the Amended Complaint be dismissed for failure to state a claim upon which relief may be granted.[12]

---

[12] In their Dispositive Motion, Defendants state that venue may not be proper in the Western District of Oklahoma. Defs.' Disp. Mot. at 8 n.1. However, they state: "Defendants do not argue for a transfer or dismissal based on venue[;] they merely point the information out should the issue arise at a later point in the litigation." *Id.* The Court will consider any venue argument when raised, to the extent it has not been waived. *See* Fed. R. Civ. P. 12(b)(3), 12(h)(1); *Stjernholm v. Peterson*, 83 F.3d 347, 349 (1996).

## NOTICE OF RIGHT TO OBJECT

The parties are advised of the right to file an objection to this Report and Recommendation with the Clerk of this Court by April 21, 2015, in accordance with 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. The parties are further advised that failure to timely object to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation does not terminate the referral in the present case.

ENTERED this 31st day of March, 2015.

_____
CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE