# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MICHAEL A. CAMPBELL,     )
                               )
       Plaintiff,         )
                               )
v.                           )          Case No. CIV-13-926-R
                               )
JODY JONES et al.,       )
                               )
       Defendants.     )

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Michael A. Campbell, a state prisoner appearing pro se, has filed suit under 42 U.S.C. § 1983, alleging that three prison employees violated his Eighth Amendment right to medical care by denying him prescribed hypertension medication both before and after his hospitalization for a stroke. United States District Judge David L. Russell has referred the matter to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b). The matter is now before the Court on the parties' cross-motions for summary judgment (Doc. Nos. 50, 52) and Plaintiff's "Motion for Directed Verdict" (Doc. No. 64).

## BACKGROUND

Plaintiff's Amended Complaint names three Defendants in their official and individual capacities who are current or former employees of Dick Conner Correctional Center ("DCCC"), a state-operated prison in Hominy, Oklahoma. Am. Compl. (Doc. No.

16) at 1-2.[1]  They are: Jody Jones, DCCC's Correctional Health Services Administrator; Rebecca Maker, a licensed practical nurse; and Nadine Kellogg, a patient care assistant. *Id.*; *see also* S.R. at 19, Jones Aff. ¶ 2 (July 31, 2014); S.R. at 24, Maker Aff. ¶ 2 (July 31, 2014); S.R. at 26, Kellogg Aff. ¶ 2 (July 31, 2014).[2]

Plaintiff's claims stem from events occurring between December 30, 2012, and January 22, 2013, beginning with Defendant Maker's and Defendant Kellogg's alleged refusal to replace Plaintiff's prescription blood-pressure medication (Lisinopril) after it was lost in a flood at DCCC.  Am. Compl. at 8-9.  Plaintiff alleges that, despite his repeated requests for the medication and his deteriorating health, Defendant Maker and Defendant Kellogg failed to provide medical care, causing Plaintiff to suffer a stroke on January 6, 2013, that resulted in hospitalization and lasting injuries.  *See id.*  Plaintiff further alleges that, upon his return to DCCC on January 9, 2013, all three Defendants failed to follow his treating physicians' discharge instructions and for thirteen days failed to provide him with prescribed medications and follow-up care.  *Id.* at 9-10.  He seeks compensatory and punitive damages against all Defendants.

On June 30, 2015, the Court granted Defendants' motion to dismiss Plaintiff's official-capacity claims and also dismissed Plaintiff's allegations that any Defendant deprived Plaintiff of a protected liberty interest without due process of law.  *See* Order

---

[1] Unless otherwise noted, citations to documents filed in this Court use the page numbers assigned by the Court's electronic filing system.

[2] Citations to the Special Report ("S.R.") (Doc. No. 23) and any exhibit thereto ("S.R. Ex.") (Doc. Nos. 23-1 to 23-37) use the consecutive page numbers stamped in those documents.

(Doc. No. 38) at 1-5; R. & R. Defs.' Disp. Mot. (Doc. No. 35) at 5-7, 36-37, 38. The Court denied Defendants' motion to dismiss Plaintiff's Eighth Amendment claims against each Defendant in her individual capacity. *See* Order at 2-5. Those are the only claims remaining in this action.

Defendants have moved for summary judgment on three grounds: (1) Plaintiff did not, prior to filing this lawsuit, exhaust his available administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); (2) Plaintiff cannot prove that any Defendant was deliberately indifferent to his serious medical needs*;* and (3) Defendants Maker and Kellogg are entitled to qualified immunity. *See* Defs.' Mot. Summ. J. & Br. in Supp. (Doc. No. 50) at 10-20, 20-25, 25-26. Plaintiff also has moved for summary judgment on the merits of his claims against each Defendant. *See* Pl.'s Mot. Summ. J. & Br. in Supp. (Doc. No. 52) at 1-16. The parties have responded to each other's motions (Doc. Nos. 56, 57), and filed reply briefs in support of their own (Doc. Nos. 61, 62). Finally, Plaintiff has filed a "Motion for Directed Verdict," Pl.'s Mot. (Doc. No. 64) at 1, to which Defendants responded on March 4, 2016 (Doc. No. 66). Plaintiff's time to file a reply to Defendants' response has expired.

In assessing whether summary judgment should be granted to any party, the undersigned has treated the factual allegations of Plaintiff's verified Amended Complaint (Doc. No. 16) and other sworn filings (*see* Doc. Nos. 1-2, 50-6), and those of the sworn Special Report (Doc. No. 23), as affidavit evidence to the extent that facts alleged therein are based on personal knowledge. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); Fed. R. Civ. P. 56(c)(4).

## STANDARD OF REVIEW

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material when they "might affect the outcome of the suit under the governing law," and a "genuine dispute" exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In making this determination, the court generally views the evidence and any reasonable inferences drawn from the record in the light most favorable to the nonmoving party. *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007).

A party moving for summary judgment has the initial burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56(c), (e). If the nonmoving party has the ultimate burden of persuasion at trial—e.g., when a defendant challenges the viability of a plaintiff's claim—the moving party may meet its initial burden "by producing affirmative evidence negating an essential element of the non-moving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks omitted); *see also Celotex Corp.*, 477 U.S. at 325. The

nonmovant must then present "specific facts showing there is a genuine issue for trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002); *see also Anderson*, 477 U.S. at 247-48. If the moving party has the ultimate burden of persuasion at trial—e.g., when a plaintiff seeks summary judgment on its claim or a defendant on its affirmative defense—the moving party initially "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt*, 539 F.3d at 1280; *see also Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

When parties file cross-motions for summary judgment, the court is "entitled to assume that no evidence needs be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted). "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

## ANALYSIS

I.     *Exhaustion of Available Administrative Remedies*

The PLRA provides that no action under 42 U.S.C. § 1983 may be brought by a prisoner regarding his or her conditions of confinement "until such administrative remedies as are available are exhausted." *See* 42 U.S.C. § 1997e(a). A remedy is "available" when there is "the possibility of some relief for the action complained of," even if it is not the kind of relief that the prisoner ultimately seeks. *Booth v. Churner*,

532 U.S. 731, 738 (2001). The PLRA requires "proper exhaustion" of available remedies so as to give prison officials the opportunity to address an inmate's complaints internally before being haled into federal court. *See Jones v. Bock*, 549 U.S. 199, 204 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90, 93-103 (2006). Proper exhaustion in turn "demands compliance with an agency's deadlines and other critical procedural rules." *Ngo*, 548 U.S. at 90. Thus, "[a]n inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under the PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002). "Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy," however, "they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust." *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010).

Failure to exhaust is an affirmative defense that the defendant must establish by showing that the plaintiff did not follow all of the required steps laid out in the prison's grievance procedure. *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011) (citing *Jones*, 549 U.S. at 212); *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007). Put differently, a defendant who asserts that a plaintiff's claim is barred under § 1997e(a) "must necessarily prove" that "administrative remedies were, in fact, available to" the plaintiff when his or her claim arose and that the plaintiff "failed to exhaust these remedies." *Purkey v. CCA Det'n Ctr.*, 263 F. App'x 723, 726 (10th Cir. 2008) (citing *Roberts*, 484 F.3d at 1241). If the defendant makes that showing on summary judgment, then it falls to the plaintiff to show that there is a genuine dispute over whether "remedies

were unavailable to him as a result of intimidation" or other impermissible interference by prison officials.  *See Tuckel*, 660 F.3d at 1254; *Little*, 607 F.3d at 1249-50.

    *A.  The Oklahoma Department of Corrections Grievance Process*

The Oklahoma Department of Corrections ("ODOC") has a multistep process through which a prisoner in its custody may seek administrative decisions or answers to complaints about most issues related to prison life.  *See generally* OP-090124 §§ II(A), IV-VIII (eff. Jan. 29, 2013) (S.R. Ex. 37 (Doc. No. 23-37) ("ODOC Grievance Process")).  In order to exhaust administrative remedies, an inmate must take a complaint through all steps of the process that are available to him or her.  These steps generally include: (i) submission of a "Request to Staff" to the law library supervisor or designated staff member, *id.* § IV; (ii) submission of a "Grievance" to the facility's Reviewing Authority or, if medical in nature, the Correctional Health Services Administrator ("CHSA"), *id.* § V; and (iii) submission of a "Grievance Appeal" to ODOC's Administrative Review Authority ("ARA") (defined as the ODOC Director, Chief Medical Officer ("CMO"), or their designee), *id.* §§ I(F), VII.

As discussed below, two additional aspects of the ODOC Grievance Process are relevant in this case.  First, an inmate may disregard the need to submit a Request to Staff to a staff member "when substantial risk of personal injury or other irreparable harm exists . . . which the grievance process will be unable to address in a timely preventative manner."  *See id.* § VIII(A).  In that case, the inmate may submit an "emergency grievance" directly to the Reviewing Authority or CHSA, who "can provide immediate resolution."  *See id.*  Second, the Reviewing Authority, CHSA, or ARA may return a

Grievance unanswered if it does not comply with certain procedural requirements, at which time the inmate generally may resubmit the Grievance within ten calendar days or (excepting a return by the ARA) appeal that disposition to the ARA. *See id.* §§ V(B)(7), VI(B)(6), VII(B)(1)(e).

### B. *Plaintiff's Efforts to Exhaust Administrative Remedies*

On January 2, 2013, Plaintiff submitted a Request for Health Services form stating that he needed 30 mg Lisinopril because he had to leave his medications in his cell when he was evacuated due to the flood at DCCC. *See* Pl.'s Req. for Health Servs., Compl. Ex. 2 (Doc. No. 1-2) at 1.[3] The next day, DCCC Nurse Manager Robert Silvis responded that Plaintiff's "meds [were] being replaced." *Id.*; *see also* S.R. at 2. Plaintiff received this response on the evening of January 4, 2013. *See* Am. Compl. at 9; S.R. at 6. Plaintiff suffered a stroke or transient ischemic attack on January 6, 2013, and remained hospitalized until January 9, 2013. Am. Compl. at 9.

<u>January 10 Request to Staff</u>

On January 10, 2013, Plaintiff submitted a Request to Staff to DCCC's Medical Unit describing his attempts to obtain Lisinopril in the week after his cell flooded. Pl.'s First Req. to Staff, Compl. Ex. 2, at 15-16. Plaintiff noted that "Nadine gave [him] 30 mg Lisin[o]pril" on the first day, but on the second day "Beka refuse[d] to give [him his] prescribed 30 mg Lisin[o]pril" and instructed him "to submit a sick call request to see the

---

[3] Plaintiff's Amended Complaint incorporates by reference the exhibits that Plaintiff attached to his original pleading. *See generally* Am. Compl. at 5-6, 9-10, 17-19; Fed. R. Civ. P. 10(c). Citations to these exhibits ("Compl. Ex.") use the attachment and page numbers assigned by the Court's electronic filing system.

doctor." *Id.* at 15. Plaintiff asked DCCC to "create, install, [and] enforce" a policy "articulating that 'no nurse shall refuse [any] high blood pressure patient high blood pressure medication.'" *Id.* at 15-16. He also asked DCCC to fire "Nurse Beka because she was very sarcastic when she denied [Plaintiff] medication and told [him] to submit a sick call request to see the doctor, when she knew the doctor had already prescribed meds." *Id.* at 15. For unexplained reasons, the DCCC Medical Unit did not receive Plaintiff's Request until January 23, 2013. *See id.* at 14-15. The next day, DCCC's CHSA (Defendant Jones) returned the form to Plaintiff because "[r]equests for disciplinary action against staff will not be addressed" through ODOC's Grievance Process. *See id.* at 14, 15-16. She instructed Plaintiff to resubmit his Request once he corrected this error. *Id.* at 14.

Emergency Medical Grievance

On January 22, 2013, prior to Defendant Jones returning a response to Plaintiff's January 10 Request to Staff, Plaintiff sent an Emergency Medical Grievance directly to ODOC's Medical Services Administrator Genese McCoy. *See* Pl.'s Resp. to Interrog. No. 10, Defs.' Summ. J. Ex. 6 (Doc. No. 50-6) at 3; Pl.'s Emergency Med. Grievance, Compl. Ex. 2, at 21-22. Plaintiff described in detail his efforts to access his prescribed treatment, including his daily Lisinopril, both before and after he was hospitalized:

> From January 1 thr[ough] January 4, 2013, I went to medical each day for my high blood pressure medication because all my property & medication was stuck in the flood on F-unit and I had been relocated to J-unit. I was feeling sick: "bl[ur]red vision, dizziness, severe headache, etc. . . ." Nurse Rebecca Maker & Nurse Nadine both refused to give me my high blood pressure medication each day (with exception of one day, Nadine gave me 30 mg Lisin[o]pril). Each day they both kept telling me to submit a sick

9

call slip and I did, but my ailment grew worse by the day, until I was hospitalized.

On January 6, 2013, an ambulance took me to the OSU Medical Center in Tulsa, Oklahoma, as a result of an unnecessary stroke that could have been prevented if Nurse Maker & Nurse Nadine would have just given me my prescribed medication. . . . I lost my ability to speak, and I lost the use of my right arm & right leg. Doctor Baker [at] OSU Medical Center . . . treated me and discharged me from the hospital on January 9, 2013, with instructions to check my blood pressure daily & follow up with [the] physician once a week for the next three weeks. He also prescribed beta blocker Metoprotol 25 mg twice daily, Asp[i]rin 8 mg daily, Lisin[o]pril 20 mg twice daily, Lipitor 20 mg twice daily & Hydrochlorothiadride 25 mg. every morning, Fall Risk & Restricted extremity use.

On January 10, 2013, I went to medical to get my blood pressure checked [be]cause I had really bad chest pains and Nurse Rebecca & Nurse Nadine, who both refused me treatment out of whimsy and prejudice in light of the history of my ex-employment in medical. January 10 & January 11, 2013, I went to my F-unit team for help. I spoke with Mr. Tom Dyer & Sgt. Stuart, who both called medical on my behalf. They instructed me that medical personnel Bob Silvis said for me to come back to medical. I did, and Nurse Maker & Nurse Nadine screamed and hollered for me to go back to my unit and fill out a sick call slip (the same thing they told me before I had the stroke). Security was called and Lt. Ferrall gave me a direct order to leave medical or to go lockup (restricted housing unit). I told him that Mr. Tom Dyer & Sgt. Stuart called medical and told me to go back to medical. Lt. Ferrall stated that "if Tom Dyer or Sgt. Stuart don't escort you back to medical, do not return to medical without a pass."

Today is January 22, 2013, the 13th day [since] I've been discharged from the hospital and I have . . . received none of Doctor Baker's prescriptions he prescribed for me; nor have medical complied with any of Doctor Baker's instructions & orders pertaining to my health and severe medical condition. I have not been reviewed by medical at all since I [was] discharged from the hospital 13 days ago and I am very sick internally but Nurse Rebecca Maker & Nurse Nadine don't see it externally and they blatantly do not care! . . . . Today I am dizzy, my vision is bl[ur]red, I have a terrible headache & I am feeling worse than I did before I was hospitalized. I need some help **DESPERATELY!!!**

Compl. Ex. 2, at 21-22 (punctuation and capitalization altered). Plaintiff requested that

three actions be taken in response to his grievance:

Administer the treatment Dr. Baker prescribed for me. Help the medical staff at DCCC to realize that their denial of my high blood pressure medication caused me to have an unnecessary stroke & potential death; and their continued denial of my medication will very well cause my death. Terminate the employment of Nurse Rebecca Maker & Nurse Nadine and the Medical Administrator of DCCC, because they are jeopardizing all the lives of the men incarcerated at the DCCC.

*Id.* at 22. On January 28, 2013, Ms. McCoy returned Plaintiff's "original correspondence unanswered for the following reason(s)":

1.  Grievance issue is not of a sensitive or emergency nature as defined in OP-090124, Section VIII; therefore, the standard grievance process must be followed.

2.  Requests for disciplinary action against staff will not be addressed through the grievance process (i.e., no remedy is available for your request to have two nurses['] employment terminated.

3.  Other: the sensitive-emergency grievance complaint was not submitted directly to the facility's **reviewing authority**, in accordance with OP-090124.

*Id.* at 19; Letter from Genese McCoy to Michael Campbell, S.R. Ex. 34 (Doc. No. 23-34) at 177; *see also* OP-090124 § VIII(A)(4) ("The offender will forward the grievance directly to the reviewing authority that can provide immediate resolution. If the complaint involves the reviewing authority and is of a sensitive nature, the grievance may be brought directly to the administrative review authority or chief medical officer, whichever is appropriate.").

<u>January 31 Request to Staff</u>

On January 31, 2013, following the return of his emergency grievance, Plaintiff submitted a revised Request to Staff to DCCC's Medical Unit. *See* Pl.'s Second Req. to Staff, Compl. Ex. 3 (Doc. No. 1-3) at 3. Plaintiff again asked officials to "create, install,

[and] enforce some type of policy articulating that 'no nurse shall refuse [any] high blood pressure patient medication for high blood pressure.'" *Id.* On February 10, 2013, Defendant Jones responded that a "medication administration policy exists." *Id.*

<u>Grievance No. 2013-6</u>

On February 12, 2013, following the return of his January 31 Request to Staff, Plaintiff submitted a Grievance, along with a copy of Defendant Jones' response to the January 31 Request to Staff, to DCCC Warden Terry Martin. *See* Pl.'s Orig. Grievance, Compl. Ex. 3, at 5-7. This submission was substantially similar to the detailed "emergency" grievance that Ms. McCoy returned unanswered on January 28, 2013. *Compare id.* at 5-6, *with* Compl. Ex. 2, at 21-22. Plaintiff's grievance was received in the Warden's Office on February 13, 2013. *See* Compl. Ex. 3, at 4-6. The same day, Tammy Cartwright, the warden's designee, returned Plaintiff's grievance unanswered with the following explanation:

> Other: **You must submit your grievance to the Correctional Health Service Administrator, Jody Jones.**

*Id.* at 4. There is no indication on the face of the document that Ms. Cartwright returned the grievance unanswered for any other reason. *Id.*; *see also* OP-090124 § V(A)(5), (B)(1).

Plaintiff then resubmitted the Grievance to DCCC's Medical Unit, which received it on February 18, 2013, and assigned it Number 2013-6. *See* Grievance No. 2013-6, Compl. Ex. 3, at 11-14; First Letter from Jody Jones to Michael Campbell, S.R. Ex. 35, at

183-84 (Mar. 4, 2013). On March 4, 2013, Defendant Jones returned the grievance unanswered with the following explanation:

> Other: Original grievance was returned unanswered on 2/13/13 due to procedural errors. Errors not corrected, therefore per policy 090124 VI.B.6 offender has waived/forfeited the opportunity to proceed in the grievance process.

Def. Jones' Resp. to Grievance No. 2013-6, S.R. Ex. 34, at 180. The same day, Defendant Jones sent Plaintiff a "Grievance Warning" letter that contained a more detailed explanation:

> On February 12, 2013 you submitted a grievance to the Warden's office that was returned to you on February 13, 2013 for failure to follow procedure.
>
> The grievance was resubmitted to . . . my office on February 18, 2013, again procedure was not followed.
>
> Your grievance has been returned unanswered due to the following procedural errors:
>
> - No additional pages allowed except for the original "Request to Staff"
> - All medical grievances will be submitted to the facility CHSA[.]

S.R. Ex. 35, at 183. This letter informed Plaintiff that he had "met the very clear criteria [for] abuse of the grievance process" because Plaintiff "continued" to submit grievances with "procedural defects, such as submitting additional pages, after having been previously warned." *Id.* at 183-84 (citing OP-090124 § XI(A)(1)(g)). Defendant Jones warned Plaintiff that "[a]ny further abuse of the grievance procedure" would result in Plaintiff being placed on grievance restriction for up to one year. *Id.* at 184.

Plaintiff resubmitted the grievance to DCCC's Medical Unit on March 8, 2013. *See* Grievance No. 2013-6, Compl. Ex. 3, at 1-2; Grievance No. 2013-6(A), S.R. Ex. 34,

at 178. On March 20, 2013, Defendant Jones sent Plaintiff a letter informing him that he had been placed on grievance restriction for twelve months because he resubmitted Grievance No. 2013-6 after being "advised that [he] had violated OP 090124.VI.B.6." Second Letter from Jody Jones to Michael Campbell, S.R. Ex. 36 (Doc. No. 23-36) at 186. Defendant Jones explained to Plaintiff that on March 4, 2013, Plaintiff had been "issued a grievance warning" for resubmitting a grievance with uncorrected errors. *Id.*

### C. Analysis

Defendants argue that they are entitled to summary judgment because Plaintiff "never completed the grievance process" with respect to his claim that Defendants were deliberately indifferent to his serious medical needs. *See* Defs.' Br. in Supp. at 29-30. "Rather than follow the proper procedure," they say, "Plaintiff continually filed non-complying grievances" and "never filed an appeal to the ARA" after Defendant Jones "proper[ly] respond[ed] . . . to Plaintiff's failure to follow the exhaustion policy." *Id.*

Defendants have produced evidence that ODOC had a process for remedying "medical[ly]" related complaints when Plaintiff's claim arose, and that such policy allowed an ODOC inmate to appeal any unfavorable grievance "response" to the ARA. *See generally* OP-090124 (S.R. Ex. 37). Plaintiff does not challenge this aspect of Defendants' summary judgment argument. *See* Pl.'s Resp. Br. (Doc. No. 57) at 6-7. Plaintiff asserts, however, that Defendant Jones "intentionally would not respond to a staff incident or claim, and used any subterfuge she could invoke to derail [P]laintiff's legitimate claim and /or exhaustion." *See* Am. Compl. at 5. In support, Plaintiff cites the documents that Defendant Jones returned to him on March 4, 2013—i.e., Plaintiff's

February 12 grievance submission, along with the attached Request to Staff; the form response returning that initial grievance unanswered on February 13, 2013; the form response regarding the grievance that Plaintiff "resubmitted to [Defendant Jones'] office" on February 18, 2013; and the "Grievance Warning" letter. *See id.*; S.R. Ex. 35, at 183.

Because nonexhaustion is an affirmative defense, Defendants initially must establish pursuant to Rule 56(c) that Plaintiff failed to properly exhaust such administrative remedies as were "available" to him. *See Little*, 607 F.3d at 1250; *Purkey*, 263 F. App'x at 726; *Thomas v. Frech*, No. CIV-08-1338-W, 2010 WL 582742, at *2-4 (W.D. Okla. Feb. 18, 2010). Defendants' arguments and evidentiary material offered in support of this defense are in some respects overly general and incomplete. *See* Defs.' Br. in Supp. at 14, 29-30 (citing S.R. Ex. 34, at 175, 179, 181; Pl.'s Resp. to Interrog. No. 3 & Req. Admis. No. 1, Defs.' Summ. J. Ex. 6, at 2, 4; Defs.' Interrog. No. 3 & Req. Admis. No. 1, Defs.' Summ. J. Ex. 7, at 10, 11).[4] Even assuming Defendants that carried that initial burden, however, the undersigned finds that Plaintiff has produced evidence supporting a reasonable inference that DCCC prison officials' actions rendered the final stage of the grievance process unavailable to him.

---

[4] For example, Defendants cite Plaintiff's sworn declaration that he "*did file* a grievance appeal regarding [his] blood pressure medicine!" to support their assertion that Plaintiff "*did not* file an appeal on any of the grievances he submitted" regarding his blood-pressure medication. Defs.' Br. in Supp. at 14 (citing Pl.'s Resp. for Admis. No. 1, Defs.' Summ. J. Ex. 6, at 4) (emphasis added)). Further, Defendants state as undisputed fact that Plaintiff "continually filed non-complying grievances" but omitted from the Special Report and their briefs certain documents required to support that assertion, such as Plaintiff's original grievance and Ms. Cartwright's February 13, 2013 response. *See id.* at 14, 29; S.R. Ex. 34, at 178 (first page of Grievance No. 2013-6(A)); Compl. Ex. 3, at 4-7 (Ms. Cartwright's response and Plaintiff's original grievance).

"Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure" to pursue the grievance process to its conclusion. *Little*, 607 F.3d at 1250. The Tenth Circuit has explained that "both prisoners and prison officials must abide by the prison's regulations." *Burnett v. Jones*, 437 F. App'x 736, 741 (10th Cir. 2011) (citing *Little*, 607 F.3d at 1249-50). This principle logically follows from the Supreme Court's holding in *Jones* that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

When prison officials at the facility level fail to abide by the ODOC Grievance Process' requirements, *and take action that would cause a reasonable inmate to believe that no further review is available to him or her*, the failure of the inmate to seek further review may be excused. While presumably rare, such circumstances may give rise to an inference that an inmate exhausted all "available" remedies—even in the absence of a proper grievance appeal—because prison officials prevented the inmate from availing himself of the final level of review. *See, e.g.*, *Jones v. Miller*, No. CIV-13-285-D, 2014 U.S. Dist. Lexis 119432, at *10-13 (W.D. Okla. Aug. 27, 2014).[5]

Here, the summary judgment record establishes that when Plaintiff's February 12 grievance submission was returned to him with the single instruction that it instead should be submitted to DCCC's CHSA, Plaintiff did so on February 18. And, then, DCCC officials: (1) returned the February 18 submission of Grievance No. 2013-6

---

[5] *Also available at* 2014 WL 4267409 (W.D. Okla. Aug. 27, 2014) (unpaginated).

unanswered for an unauthorized reason; (2) did not afford Plaintiff the opportunity to revise and resubmit this grievance, for the same unauthorized reason; (3) instructed Plaintiff without proper basis that his ability to participate in the Grievance Process was "waived/forfeited"; and (4) stated to Plaintiff that "[a]ny further abuse of the grievance procedure" would result in him being placed on grievance restriction. These facts support a reasonable inference that Defendant Jones' conduct interfered with Plaintiff pursuing the Grievance Process beyond the facility level.

First, the materials before the Court support a reasonable inference that Defendant Jones' return of Grievance No. 2013-6 was not authorized by the terms of ODOC's Grievance Process. Defendant Jones stated on the form response that Plaintiff's February 18 submission "[wa]s being returned unanswered" because he had "not corrected" the "procedural errors" that had been identified when the original submission was returned unanswered. Compl. Ex. 3, at 10. But the *single* error that had been identified when the original submission was returned was *to whom* the Grievance should be sent. *Id.* at 4 (stating that Plaintiff "must submit [his] grievance to the Correctional Health Services Administrator, Jody Jones" rather than to the Warden's office). Defendants admit that Plaintiff "submitted the exact same grievance to Defendant Jones" on February 18, 2013. Defs.' Br. in Supp. at 14, 29; *see also* S.R. Ex. 35, at 183. Thus, Plaintiff's February 18 submission corrected the only procedural error that had been identified by DCCC officials.

Defendants do not directly dispute this correction but, instead, assert that "Defendant Jones returned the [February 18 resubmitted] grievance unanswered because

it was *addressed* to the warden instead of to the CHSA." Defs.' Br. in Supp. at 29 (emphasis added). The ODOC Grievance Process provides instructions on where medical grievances should be submitted, but it does not expressly require an inmate to "address" medical grievances to any particular individual or official. *See* OP-090124 § V(A)(5), (B)(1). While Plaintiff's resubmitted grievance was still "addressed" to Warden Martin, there is no evidence that it was "submitted" to the Warden instead of to Defendant Jones. Nor did Defendant Jones state at the time that she was declining to answer the grievance for that reason. *See, e.g.*, Compl. Ex. 3, at 12; S.R. Ex. 34, at 180; S.R. Ex. 35, at 183. Defendants' post-hoc justification for the return of the February 18 resubmitted grievance is not persuasive. *Cf. Williams v. Miller*, No. CIV-14-61-W, 2015 WL 1207011, at *14 (W.D. Okla. Mar. 12, 2015) (finding that prison officials who returned grievance appeal for inmate's failure to use his full first name exceeded their authority because ODOC's Grievance Process contains no such requirement).

Second, the materials before the Court support a reasonable inference that Defendant Jones—upon returning the February 18 resubmitted grievance—did not afford Plaintiff an opportunity to correct any new errors that he might have made when resubmitting his grievance to the proper office. The explanation for this action given by Defendant Jones was:

> Original grievance was returned unanswered on 2/13/13 due to procedural errors. Errors not corrected, therefore per policy 090124 VI.B.6 offender has waived/forfeited the opportunity to proceed in the grievance process.

Compl. Ex. 3, at 10; S.R. Ex. 34, at 180. This conclusion was unfounded because, as noted above, Plaintiff in fact had corrected the previous error.[6]

Third, the materials before the Court support a reasonable inference that, in addition to improperly returning Grievance No. 2013-6 unanswered and denying Plaintiff the opportunity to resubmit the grievance, Defendant Jones affirmatively discouraged Plaintiff from taking any further steps towards proper exhaustion. Specifically, Defendant Jones stated to Plaintiff, upon returning his February 18 resubmitted grievance, that he "ha[d] waived/forfeited the opportunity to proceed in the grievance process." S.R. Ex. 34, at 180. That statement was unauthorized. The Grievance Process allows a Reviewing Authority or CHSA to return a grievance unanswered "and notify [the inmate] to correct the errors within" ten days. *See* OP-090124 §§ V(A)(5), VI(A)(2), VI(B)(6). Only if the inmate "fails to correct the errors," does the Grievance Process authorize the Reviewing Authority or CHSA to determine that the inmate has "waived/forfeited the opportunity to proceed in the grievance process." *See id.* § VI(B)(6). Because Plaintiff had corrected the error of which he had been notified, and

---

[6] The "Grievance Warning" letter sent by Defendant Jones to Plaintiff added that the February 18 resubmitted grievance was returned unanswered because, "No additional pages allowed except for the original 'Request to Staff.'" S.R. Ex. 35, at 183. Plaintiff's exhibits indicate that he might have attached the notice from DCCC of the rejection of the February 12 submission to his grievance when he resubmitted it on February 18, 2013. *See* Compl. Ex. 3, at 11-14; Defs.' Br. in Supp. at 29. Even if that attachment amounted to a procedural error that would warrant return of the February 18 resubmitted grievance, the cited error was a new one and, thus, the Grievance Process required Defendant Jones to "notify [Plaintiff] to correct the error[] within 10 calendar days." OP-090124 § VI(B)(6); *see also id.* § V(A)(7).

Defendants point to no other procedural error that Plaintiff was given the opportunity to correct but did not, Defendant Jones' invocation of this waiver rule was improper.

Moreover, Defendant Jones, on the same day as she returned the February 18 resubmitted grievance, stated to Plaintiff that "[a]ny further abuse of the grievance process" would result in Plaintiff being "placed on grievance restriction" for up to one year. S.R. Ex. 35, at 183-84. Plaintiff was in fact placed on 12-month grievance restriction when he apparently attempted to correct the new procedural error that Defendant Jones identified in her letter. *See* S.R. Ex. 36, at 186; Compl. Ex. 3, at 11-15.

Under these facts, this is not a case where the inmate "opt[ed] out of the grievance process" by choosing to "ignore" a prison official's determination that he "present[ed] a defective or non-complying grievance." *Brewer v. Mullin*, 130 F. App'x 264, 265-66 (10th Cir. 2005). Rather, the summary judgment record supports a reasonable inference that DCCC officials improperly prevented Plaintiff from completing the grievance process. When reviewing officials "exceed their authority" in rejecting a grievance submission, they "render[] the final step of exhaustion unavailable." *Little*, 607 F.3d at 1250. Accordingly, the undersigned finds that Defendants are not entitled to summary judgment on their affirmative defense that Plaintiff failed to exhaust his available administrative remedies before coming to federal court.

## II. *Plaintiff's Eighth Amendment Claim of Deliberate Indifference to a Serious Medical Need*

Plaintiff claims, pursuant to 42 U.S.C. § 1983, that Defendants violated his Eighth Amendment rights by failing to provide him prescribed hypertension medication both

prior to and after his hospitalization for a stroke.  Defendants Maker, Kellogg, and Jones each assert that summary judgment should be granted in her favor on the merits of Plaintiff's claim because his evidence "fails to establish" that she was deliberately indifferent to Plaintiff's serious medical needs.  *See* Defs.' Br. in Supp. at 15-17, 17-20, 20-22, 22-25.  Defendants Maker and Kellogg assert that they are entitled to qualified immunity for the same reason.  Defs.' Br. in Supp. at 31.[7]  The undersigned addresses Defendants' arguments in the same order as they were raised, but in doing so notes (as did Defendants) the differing applicable burdens.

### A.  *Legal Standards Generally*

A plaintiff seeking to hold a government-official defendant personally liable under § 1983 must ultimately prove that such defendant, "through the official's own individual actions, has violated" a right secured to the plaintiff by the Constitution and laws of the United States.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996).  This requires the plaintiff to prove that the defendant was both personally involved in the conduct complained of and acted with the state of mind required to violate the federal right in question.  *See Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011).

The Constitution, through its Eighth Amendment, imposes on state governments an "obligation to provide medical care for those whom [they are] punishing by

---

[7] As at the motion-to-dismiss stage, Defendants' assertion that "Defendants are entitled to qualified immunity" is limited to Plaintiff's claims against Defendants Maker and Kellogg.  *See* Defs.' Br. in Supp. at 31 (discussing only these two Defendants' interactions with Plaintiff); Defs.' Disp. Mot. at 30-31 (same).

incarceration.  An inmate must rely on prison authorities to treat his medical needs; if they fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *accord Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011); *West v. Atkins*, 487 U.S. 42, 56 (1988).  However, "[b]ecause society does not expect that prisoners will have unqualified access to health care," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), an inmate cannot hold a prison official liable unless the inmate shows that he or she suffered "acts or omissions sufficiently harmful to evidence deliberate indifference to [the inmate's] serious medical needs," *Gamble*, 429 U.S. at 106.  "It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Gamble*, 429 U.S. at 106.

The Tenth Circuit "recognize[s] two types of conduct [that] may constitute deliberate indifference in a prison medical case: (1) a medical professional failing to treat a serious medical condition properly; and (2) a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition." *Self v. Crum*, 739 F.3d 1227, 1231 (10th Cir. 2006).  "The test for constitutional liability" in either case "involves both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (internal quotation marks omitted).

As to the objective component, the "prisoner must produce . . . evidence that the deprivation at issue was . . . 'serious'" enough to violate the Eighth Amendment. *See id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotations marks omitted). Where a prisoner seeks to recover for "harm caused by a delay in medical treatment, he or she must show that the delay resulted in substantial harm in order to satisfy the objective prong of the deliberate indifference test." *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (internal quotation marks omitted). The subjective component is met if the official was "aware of facts from which the inference could be drawn" that his or her conduct posed a "substantial risk of serious harm" to the prisoner's health or safety and that the official "also dr[ew] the inference." *Farmer*, 511 U.S. at 837.

### B. Material Factual Allegations Supported by the Record

Plaintiff was diagnosed with hypertension and prescribed once-daily Lisinopril in November 2010. *See* Am. Compl. at 7-8; Am. Answer (Doc. No. 46) at 7; Medication List, S.R. Ex. 2 (Doc. No. 23-2) at 36; Clinic Visit Record, S.R. Ex. 10 (Doc. No. 23-10) at 72; Defs.' Br. in Supp. at 7. Plaintiff was allowed to keep this medication in his cell so that he could take it "on a regular schedule as prescribed." Am. Compl. at 8; *see also* Pl.'s Aff. ¶ 1, Compl. Ex. 2, at 2. Plaintiff took his medication as prescribed, *see* S.R. Ex. 10, at 72-74, and "never experienced any difficulties as a result of his heart . . . condition" before January 2013. Am. Compl. at 8.

On December 30, 2012, Plaintiff's housing unit at DCCC "flooded with raw sewage and waste water." Am. Compl. at 8; *see also* Goulsby Aff. ¶ 1, Compl. Ex. 2, at 5; Green Aff. ¶ 1, Compl. Ex. 2, at 4; Interoffice Mem., S.R. Ex. 3 (Doc. No. 23-3) at 39-40 (Jan. 2, 2013). DCCC staff members evacuated the housing unit, requiring Plaintiff to

relocate to another unit without his personal property, "including medications" he was allowed to keep with him (i.e., "Keep on Person" medication). Am. Compl. at 8; *see also* Goulsby Aff. ¶ 1; Green Aff. ¶ 1.

During the relevant time period, DCCC provided daily doses of prescription medications to inmates through a "pill line" located in the Medical Services Unit. Jones Aff. ¶¶ 2, 4, Defs.' Summ. J. Ex. 4 (Doc. No. 50-4); *see also* Defs.' Br. in Supp. at 8. The pill line was "available three times a day at medical for [inmates] to receive their doses of medications, as they are prescribed by their providers." Jones Aff. ¶ 2. Supplies of "Keep on Person" medications were also provided through the pill line in Medical Services. *Id.* ¶ 5. Where, as here, an inmate "loses or runs out of his 'Keep on Person' medications," that inmate could "receive daily doses of the medication at the pill line until the 'Keep on Person' supply [was] refilled." *Id.* ¶ 4; *see also id.* ¶ 8. At the time, inmates who went "to Medical Services asking specifically for prescribed medications [were] given their dose form the pill line, subject to confirmation from nurses that they have a current order." *Id.* ¶ 7. They were "not required to fill out sick call slips to pick up medication at the pill line." *Id.* ¶ 6.

Plaintiff made several visits to DCCC's Medical Services Unit attempting to obtain his Lisinopril in the week between December 31, 2012, and January 6, 2013. Am. Compl. at 8; *see also* Defs.' Summ. J. Ex. 6, at 2, 5; Goulsby Aff. ¶ 1. Plaintiff explains that he "went to medical as instructed every day of [his] flood displacement and requested [his] *prescribed* medications along with approx. 20 other[ inmates]" who were evacuated from the same housing unit. Defs.' Summ. J. Ex. 6, at 5. Plaintiff and his

fellow inmates "were instructed to go to medical each morning for [their] meds until medical could issue/re-order" their Keep on Person supplies.  *Id.* at 4.  Plaintiff asserts that he was the only one in this group who was repeatedly denied medication that "had already been prescribed to [him]."  *Id.* at 3, 4.

The parties agree that Plaintiff encountered Defendants Maker and Kellogg on January 2 and 3.  *See* Pl.'s Aff. ¶ 1; Defs.' Summ. J. Ex. 6, at 2; Maker Aff. ¶¶ 4-5; Kellogg Aff. ¶¶ 4-5.  Plaintiff states that he also encountered both Defendants on January 4 and 5.[8]  Defs.' Summ. J. Ex. 6, at 2.  On each of these four visits, Plaintiff told Defendants Maker and Kellogg that he needed his "prescribed medications" and that he was "experiencing blurred vision, dizziness, severe headaches and an overall sickly feeling."  *See* Am. Compl. at 8-9; Pl.'s Aff. ¶ 1; Defs.' Summ. J. Ex. 6, at 2, 5.  Plaintiff states that Defendants Maker and Kellogg refused to listen to him and "cursed [Plaintiff] out" when he asked for his medication.  Defs.' Summ. J. Ex. 6, at 5.

On January 2 and 3, Defendants Maker and Kellogg told Plaintiff that "he needed to submit a 'Sick Call Request' and wait to have an appointment set to see a doctor," Am. Compl. at 8, even though they knew that Plaintiff's doctor had already prescribed Lisinopril.  Pl.'s Aff. ¶ 1; *see also* Defs.' Summ. J. Ex. 6, at 2.  "Plaintiff attempted to further explain the situation, asking only that more medication be issued to him on an

---

[8] ODOC timesheets indicate that Defendants Maker and Kellogg both worked on all four days.  Jan. 2013 Time Sheets, S.R. Ex. 21 (Doc. No. 23-21) at 103, 105.  Defendants Maker and Kellogg do not dispute Plaintiff's allegation that he encountered both Defendants on January 4 and 5, 2013.  *See* Defs.' Br. in Supp. at 9-10, 20-21, 22-24.

emergency basis due to the circumstance, to no avail."  Am. Compl. at 8; *see also* Pl.'s Aff. ¶ 1; Defs.' Summ. J. Ex. 6, at 2, 5.

Defendant Maker and Defendant Kellogg each admit that she personally told Plaintiff to fill out a sick call request on January 2 and 3, 2013.  *See* Maker Aff. ¶¶ 4-5; Kellogg Aff. ¶¶ 4-5.  Each also states that Plaintiff "routinely" came to Medical Services without submitting a sick call request, and, when he did, "he would be instructed to follow [ODOC] policy before entering the building."  Maker Aff. ¶ 6; Kellogg Aff. ¶ 6. The record indicates that Defendants Maker and Kellogg each knew that Plaintiff was among a group of inmates who lost their "Keep on Person" medications in the flood.  *See, e.g.*, Defs.' Summ. J. Ex. 6, at 5; Defs.' Resp. to Pl.'s Interrogs. & Reqs. for Admis., Defs.' Resp. Ex. 1 (Doc. No. 56-1) at 7.  At the time, both Defendants were responsible for "giv[ing] medications that the providers order."  *See* Defs.' Resp. Ex. 1 at 3; Defs.' Br. in Supp. at 23-24.

On January 2, Plaintiff submitted a Request for Health Services asking for 30 mg Lisinopril.  Am. Compl. at 9; Compl. Ex. 2, at 1.  On the evening of January 4, Plaintiff received a response to his Request stating that his "meds [were] being replaced."  *See* Am. Compl. at 9; Compl. Ex. 2, at 1.  Defendants Maker and Kellogg did not give Plaintiff his Lisinopril when he requested it on January 5, 2013.  *See* Defs.' Summ. J. Ex. 6, at 2.  DCCC inmate Joshua Goulsby "witness[ed] [Plaintiff] attempting to get his medication" "during that week" while Mr. Goulsby was at Medical Services getting his asthma treatments.  Goulsby Aff. ¶ 1.  Mr. Goulsby recalls that Defendants Maker and Kellogg "were very rude to [Plaintiff] and refused him his high blood pressure

medication, and demanded that he leave and fill out a sick call slip and do not return without a pass." *Id.*

Another inmate, Brian Green, observed Plaintiff's health deteriorating around this time. *See* Green Aff. ¶ 1. Specifically, Mr. Green noticed that Plaintiff's "mouth was starting to twist to the right side of his face, and [Mr. Green] kept telling [Plaintiff] to wipe his mouth, because he kept drooling." *Id.* Mr. Green continues:

> On January 6, 2013, I had to physically help [Plaintiff] walk to his cell and when I tried to talk to him, he could not verbally speak.[ So,] I ran[] to get C.O. Gross. C.O. Gross checked [Plaintiff] out and called medical immediately, without hesitation. Medical came quickly, with a wheel chair and carted [Plaintiff] off to medical.

*Id.*

Plaintiff arrived at Medical Services at 12:45 p.m. on January 6, 2013. *See* Clinic Visit Record, S.R. Ex. 23 (Doc. No. 23-23) at 110; Progress Note, S.R. Ex. 24 (Doc. No. 23-24) at 112. Plaintiff told Katrinka Sutton, RN, that "he had been out of blood pressure medicine [for] one week" and now felt dizzy and confused. S.R. Ex. 23, at 110. Nurse Sutton set up an appointment for Plaintiff to see a physician the following morning and released Plaintiff back to his cell at 1:15 p.m. *See* S.R. Ex. 24, at 112. She also gave Plaintiff a thirty-day supply of 30 mg Lisinopril.[9] *See* Jan. 2013 Medication Admin. Record, S.R. Ex. 22, at 107; *see also* Defs.' Resp. Ex. 1, at 4-5.

---

[9] Plaintiff denies that he received a 30-day supply of Lisinopril between December 31, 2012, and January 22, 2013. *See, e.g.*, Pl.'s Aff. ¶ 1; Defs.' Resp. to Pl.'s First Interrogs., Pl.'s Reply Br. Ex. 1 (Doc. No. 57-1) at 4, 5. Plaintiff states that Defendant Kellogg gave him a 30 mg Lisinopril pill on "one day" before January 4, 2013. *See* Pl.'s Aff. ¶ 1; Pl.'s Reply Br. Ex. 1, at 6. But Plaintiff's "Medicine Administration Record" does not

That evening, Plaintiff returned to Medical Services because he "lost his ability to speak and the ability to move his right arm and his right leg." Am. Compl. at 9; *see also* Pl.'s Aff. ¶ 1; Compl. Ex. 3, at 16. Nurse Sutton observed that Plaintiff exhibited right-sided weakness, decreased muscle control on the right, and "right side deviation to [the] tongue when stuck out." Progress Note, S.R. Ex. 25 (Doc. No. 23-25) at 114. She ordered a "medically mandatory/emergency" transfer by ambulance to OSU Medical Center in Tulsa. *See* Am. Compl. at 9; S.R. Ex. 25, at 114-15.

Plaintiff remained hospitalized until January 9, 2013. *See* Am. Compl. at 9; Compl. Ex. 2, at 6-8. Upon discharge, Rebecca Wright, DO, and Damon Baker, DO, diagnosed Plaintiff with "poorly controlled" hypertension status-post left-insular stroke (or transient ischemic attack) "due to apparent lack of antihypertensive medication." Okla. State Univ. Med. Ctr. Records, S.R. Ex. 26 (Doc. No. 23-26) at 122-23; Compl Ex 2, at 6; Am. Compl. at 9. Drs. Wright and Baker's discharge instructions contain the following time-sensitive directives:

1. Plaintiff "is to be discharged with [five] medications," including an increased dose of Lisinopril;

2. Plaintiff "is to follow up with blood pressure check[s] daily for the next 2 weeks";

3. "These blood pressures should be forwarded to the [ODOC] physician who should adjust [Plaintiff's] blood pressure medication appropriately"; and

---

corroborate that assertion, and Defendant Kellogg affirmatively denies giving Plaintiff "one day's worth" of Lisinopril between January 2 and 4, 2013. *See* S.R. Ex. 22, at 107; Defs.' Resp. Ex. 1, at 4-5; Pl.'s Reply Br. Ex. 1, at 6.

4. Plaintiff is to "follow up once a week for at least 3 weeks" with the DOC physician "for monitoring and adjustment of blood pressure meds."

S.R. Ex. 26, at 122, 123 ("We will increase his Lisinopril upon discharge with expected follow-up by [ODOC] physician."); Compl. Ex. 2, at 6, 8. Drs. Wright and Baker also instructed that Plaintiff should contact a doctor if his blood pressure reached a level greater than 189/100. Compl. Ex. 2, at 6.

Plaintiff returned to DCCC around 2:30 p.m. on January 9, 2013. *See* Am. Compl. at 9; S.R. Ex. 26, at 121. A nurse took Plaintiff's vital signs, and a physician ordered each of the medications that Drs. Wright and Baker listed on Plaintiff's discharge instructions. *See* S.R. at 11; S.R. Ex. 26, at 121; Prescription Orders, S.R. Ex. 28 (Doc. No. 23-28) at 145-50; Compl. Ex. 5, at 6. There is no indication, however, that Plaintiff was provided these medications, or told that his new prescriptions had been filled, until January 22, 2013. *See* S.R. Ex. 22, at 107-08; Pl.'s Aff. ¶ 1.

Plaintiff alleges that "Defendants Maker and Kellogg continued to exhibit deliberate indifference to [Plaintiff's] confirmed serious medical need" when he twice sought follow-up care between January 9 and 11, 2013. *See* Am. Compl. at 9-10; Pl.'s Aff. ¶ 1. On January 10, Defendant Kellogg noted that Plaintiff was "brought to medical on [a] complaint of chest pain" that afternoon, and that she "instructed him to fill out a sick call slip." Clinic Visit Record, S.R. Ex. 27 (Doc. No. 23-27) at 143. Her clinic notes indicate that Plaintiff informed her that he had been discharged from the hospital one day earlier. *Id.* Plaintiff "returned to his unit and sought assistance from his program facilitator," Tom Dyer, who "placed a call to Medical Services [and] described

[Plaintiff's] complaints" to the nurse manager, Robert Silvis. Am. Compl. at 9; *see also* S.R. at 28, Dyer Aff. ¶ 3 (July 31, 2014). Mr. Silvis instructed Mr. Dyer "to send [Plaintiff] to Medical Services" to be assessed. Am. Compl. at 9; *see also* Pl.'s Aff. ¶ 1; Dyer Aff. ¶ 3 (stating that this incident occurred "[o]n or about January 9, 2013"). Plaintiff also asserts that Defendants Maker and Kellogg again told him to fill out a sick call slip when he requested his Lisinopril on this date. *See* Defs.' Summ. J. Ex. 6, at 2.

On January 11, Plaintiff went to Medical Services "to have his blood pressure checked[] because he was suffering from terrible chest pains," but "Defendants Maker and Kellogg again refused him medical care." Am. Compl. at 9. Plaintiff returned to his unit and spoke to Sargent Sharon Stewart, who called Medical Services and was instructed by Mr. Silvis to send Plaintiff to Medical Services to be assessed. *See* Am. Compl. at 9-10; Pl.'s Aff. ¶ 1; S.R. at 23, Stewart Aff. ¶ 3 (July 21, 2014) (stating that this incident occurred "[o]n or about January 10, 2013"). Plaintiff went to Medical Services "as ordered, but this time Defendants Maker and Kellogg . . . screamed and hollered for [Plaintiff] to leave, return to his unit and fill out a sick call slip, and not to return until called by medical personnel."[10] Am. Compl. at 10; Pl.'s Aff. ¶ 1.

---

[10] Plaintiff also asserts that a Lieutenant Ferrell, who is not a defendant to this action, told Plaintiff that he would be placed in segregated housing if he did not leave Medical Services. Am. Compl. at 10; Pl.'s Aff. ¶ 1. Plaintiff states that Lieutenant Ferrell told him that he was not permitted to return to Medical Services unless he was escorted by an official from Plaintiff's unit or had a "pass" for Medical Services. Am. Compl. at 10; Pl.'s Aff. ¶ 1. Correctional Officer Stephen Ferrell admits that "[o]n more than one occasion [he] gave the Plaintiff a direct order to leave the Health Service Unit and [to] put in a sick call request." S.R. at 22, Ferrell Aff. ¶ 3 (July 31, 2014).

As of January 22, 2013, Plaintiff had not received "any follow-up examination performed by any medical staff or receive[d] any of the medications that Dr. Baker" and Dr. Wright had prescribed. Am. Compl. at 10; *see also* Compl. Ex. 11, at 22-23 (Emergency Grievance dated Jan. 22, 2013); S.R. Ex. 22, at 107-08 (medical record indicating post-discharge medications issued to Plaintiff on Jan. 22, 2013); S.R. Ex. 29, at 154 (medical record indicating no vital signs taken between Jan. 10 and Jan. 22, 2013); S.R. Ex. 30, at 158-60 (medical record documenting first post-discharge appointment with physician on Jan. 25, 2013). Plaintiff went to Medical Services on that date for a scheduled dental appointment. Am. Compl. at 10; Pl.'s Aff. ¶ 1; S.R. Ex. 33, at 173.

Plaintiff states that during this visit Nurse Sutton told him that his medications "had been available since January 9, 2013," and "asked why [Plaintiff] had not been down there to pick them up before then." Am. Compl. at 10; *see also* Pl.'s Aff. ¶ 1. Plaintiff explained that Defendants Maker and Kellogg had instructed him "not to return to Medical Services without a pass." *See* Am. Compl. at 10, 17; Pl.'s Aff. ¶ 1. Plaintiff recalls that Nurse Sutton "seemed very concerned" and explained that Plaintiff "risked another stroke, heart attack or death" each day he did not take his medications. Am. Compl. at 10; *see also* Pl.'s Aff. ¶ 1. Nurse Sutton admits that on January 22, 2013, she "did educate [Plaintiff] about the dangers of being non-compliant with his prescribed medications and that without the medication he could be at risk of another stroke, heart attack[,] or death." S.R. at 21, Sutton Aff. ¶ 3 (July 31, 2014). Nurse Sutton gave Plaintiff his new blood-pressure medication and noted that Medical Services "will schedule for BP checks and provider appt." S.R. Ex. 33 at 173. Plaintiff had his first

follow-up appointment with a DOC physician on January 25, 2013. *See* S.R. Ex. 30, at 158-60.

### C. Whether Any Defendant Is Entitled to Summary Judgment on the Merits of Plaintiff's Eighth Amendment Claim

Because Plaintiff has the ultimate burden to prove the elements of his claim, *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005), Defendants—in order to prevail on their motion for summary judgment—"bear[] the initial burden of production to show the absence of a genuine issue of material fact" and that they are entitled to judgment as a matter of law, *Trainor*, 318 F.3d at 979. This initial burden can be met "either by producing affirmative evidence negating an essential element" of Plaintiff's claim against them, "or by showing that [Plaintiff] does not have enough evidence to carry [his] burden of persuasion at trial." *Pelt*, 539 F.3d at 1280. If Defendants "fail[] to carry [their] initial burden of production," Plaintiff "may defeat [the] motion for summary judgment without producing anything." *Trainor*, 318 F.3d at 979. If that initial burden is met, however, then the burden shifts to Plaintiff to "to set forth specific facts showing that there is a genuine issue for trial." *Leone*, 810 F.3d at 1153.

### 1. Objective Component

All three Defendants argue that Plaintiff cannot prove the objective component of his deliberate-indifference claim for the time period of January 9, 2013 (the date of Plaintiff's return to DCCC upon being discharged from the hospital) to January 22, 2013. Defs.' Br. in Supp. at 16-17. Noting that in cases involving *delay* of inmate medical care the Tenth Circuit requires proof of "substantial harm," Defendants argue that Plaintiff's

claim fails insofar as the post-discharge period because he has neither "allege[d]" nor "shown any lifelong handicap, permanent loss, or considerable pain related to the delay in receiving his medication."  Defs.' Br. in Supp. at 16 (citing *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

As an initial matter, Defendants in their motion do not question Plaintiff's ability to prove that his medical needs were "serious" enough to meet the objective component of his deliberate-indifference claim insofar as the events leading up to his hospitalization from January 6 to 9, 2013.  *See* Defs.' Br. in Supp. at 15-17; Fed. R. Civ. P. 56(a)(1). Thus, the undersigned assumes, and the summary judgment record reflects, that the objective component is met for that period.

Regarding the post-discharge period, Drs. Wright's and Baker's discharge instructions, which are dated January 9, 2013, required follow-up care to be provided within a set timeframe: (1) Plaintiff "is to be discharged with the [listed] medications"; (2) Plaintiff "is to follow up with blood pressure check[s] daily for the next 2 weeks"; (3) "[t]hese blood pressures should be forwarded to the [DOC] physician who should adjust" Plaintiff's new "blood pressure medication appropriately"; and (4) Plaintiff is to "follow up once a week for at least 3 weeks" with the DOC physician "for monitoring and adjustment of blood pressure meds."  S.R. Ex. 26, at 122; Compl. Ex. 2, at 6, 8.  There is no genuine dispute that this treatment was not provided to Plaintiff within the time prescribed by his physicians.  *See, e.g.*, S.R. Ex. 22, at 107-08; S.R. Ex. 29, at 154; S.R. Ex. 30, at 158-60.  On the other hand, Plaintiff has alleged little in the way of permanent

injury resulting from the failure to provide medication and follow-up care as set forth in the post-discharge instructions.

"A medical need is sufficiently serious," such that it can give rise to an Eighth Amendment violation, "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751 (internal quotation marks omitted). In cases premised on a mere delay in treatment, a prisoner-plaintiff "must 'show that the delay resulted in substantial harm' in order to satisfy the objective prong of the deliberate indifference test." *Al-Turki*, 762 F.3d at 1193 (quoting *Garrett*, 254 F.3d at 950). The Tenth Circuit has explained "that the substantial harm requirement *may* be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (emphasis added); *see also Mata*, 427 F.3d at 751; *Garrett*, 254 F.3d at 950; *McBride v. Deer*, 240 F.3d 1287, 1290 (10th Cir. 2001). *Contra* Defs.' Br. in Supp. at 16 ("The delay *must* cause 'a lifelong handicap, permanent loss, or considerable pain' to satisfy the objective component of an Eighth Amendment claim." (emphasis added) (quoting *Garrett*, 254 F.3d at 950)).

It is not apparent that the 13-day failure to provide post-hospitalization medication at issue here is the type of mere "delay" discussed in the cases cited above. Rather, the materials before the Court on summary judgment show that Plaintiff's "poorly controlled" hypertension had been diagnosed by two hospital physicians as mandating specific treatment, to be provided within a specific timeframe—and that was not done. *See, e.g.*, S.R. Ex. 26, at 122-23, S.R. Ex. 30, at 158-60; Sutton Aff. ¶ 3. In any event,

the summary judgment record contains assertions of significant pain by Plaintiff following his discharge on January 9. Plaintiff complained to Defendants Maker and Kellogg of chest pain on both January 10 and 11. *See* S.R. Ex. 27, at 143 (Defendant Kellogg's clinic note that on Jan. 10, 2013, Plaintiff was "brought to medical on [a] complaint of chest pain"); Am. Compl. at 9 (Plaintiff stating that on Jan. 11, 2013, he went to Medical Services "to have his blood pressure checked[] because he was suffering from terrible chest pains"). Further, Plaintiff states that as a result of the denial of medication during the entire period at issue, he "now regularly experiences nervous tics, spasms, bouts of forgetfulness, muscle twitches, dizziness." Am. Compl. at 8, 12. Those facts are sufficient to create a genuine question as to whether Plaintiff suffered pain and other symptoms during the post-discharge period such as would allow a reasonable factfinder to determine that the objective prong of Plaintiff's Eighth Amendment claim has been met.

Moreover, "[d]elays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (internal quotation marks and citation omitted); *see also Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)). Here, as specifically relevant to the post-discharge period, Nurse Sutton stated that Plaintiff was at an increased risk of "another stroke, heart attack, or death" without his prescription antihypertensive medication. Sutton Aff. ¶ 3.

The record supports a reasonable inference that the 13-day delay in providing Plaintiff with post-hospitalization medication represents a "deprivation . . . sufficiently serious" to satisfy the Eighth Amendment's objective component. *Farmer*, 511 U.S. at 834 (internal quotation marks omitted); *see also Hudson*, 503 U.S. at 9 (citing *Gamble*, 429 U.S. at 103-04). Accordingly, the undersigned finds that Defendants have not shown the absence of a genuine dispute over whether Plaintiff's medical needs were sufficiently serious to satisfy the objective component of his deliberate-indifference claims or that Defendants are entitled to judgment as a matter of law.

### 2. Subjective Component

Again, to prevail on his Eighth Amendment deliberate indifference claim, Plaintiff ultimately must prove that each Defendant was both personally involved in the conduct complained of and "acted or failed to act despite [her] knowledge of a substantial risk of serious harm" to Plaintiff's health or safety. *Farmer*, 511 U.S. at 842. Each Defendant argues that Plaintiff's evidence is insufficient to reasonably do so.

*Defendant Kellogg*

Describing herself as a mere "gatekeeper," Defendant Kellogg argues that she is entitled to summary judgment because "[t]he undisputed facts" show that she neither "prevent[ed]" Plaintiff "from receiving medical treatment" nor "denied [Plaintiff] access to medical providers." Defs.' Br. in Supp. at 20. However, the summary judgment record, as detailed above, indicates that Defendant Kellogg personally was involved in the provision of medication to prisoners as part of her work at DCCC's Medical Services

unit, was aware of Plaintiff's need for medication and attempts to obtain it, and refused to provide the prescribed medication to him.

Plaintiff asserts Defendant Kellogg brusquely turned him away when he asked for his prescribed medication on January 2, 3, 4, 5, and 10, 2013. Specifically, Plaintiff states that Defendants Maker and Kellogg "would not listen" to Plaintiff and told him to submit a sick call request each time he asked for Lisinopril on January 2 and 3 (Pl.'s Aff. ¶ 1; *see also* Goulsby Aff. ¶ 1); Plaintiff complied with Defendants' initial instruction and was told that his "meds [were] being replaced" as of January 3 (Compl. Ex. 2, at 1); prior to being hospitalized from January 6-9 as a result of a stroke or other medical event, Plaintiff asked Defendants Maker and Kellogg for his medication twice more "to no avail" even though he told them that he was "experiencing blurred vision, dizziness, severe headaches[,] and an overall sickly feeling" (*see* Am. Compl. at 8-9; Pl.'s Aff. ¶ 1; Defs.' Summ. J. Ex. 6, at 2, 5); and after being hospitalized, Plaintiff on January 10 and 11 complained to Defendants Maker and Kellogg of chest pains and requested his medication (S.R. Ex. 27, at 143; Am. Compl. at 9). Defendant Kellogg admits that she was responsible for "giving out medications that the providers order," that she instructed Plaintiff to fill out sick call requests on January 2 and 3, that Plaintiff "routinely entered the Health Services Unit without submitting a sick call request or a pass from medical staff," and, when he did, "he would be instructed to follow the [ODOC] policy before

entering the building." Defs.' Resp. Br. Ex. 1, at 3; Kellogg Aff. ¶ 6.[11] These materials are sufficient to create a reasonable inference that Defendant Kellogg was personally involved in the conduct complained of and "acted or failed to act despite [her] knowledge of a substantial risk of serious harm" to Plaintiff's health or safety. *Farmer*, 511 U.S. at 842.[12]

Further, Defendant Kellogg argues that she merely fulfilled her "gatekeeping" role by instructing Plaintiff to fill out a sick call request each time he sought care. *See* Defs.' Br. in Supp. at 20-22. Drawing conclusions from DCCC's general practice for issuing prescription medications, Defendant Kellogg argues:

> If Plaintiff had been seeking his Lisinopril on those days, a daily dose was available at the Medical Services pill line. This fact is supported by Plaintiff's claim that he *did* receive one dosage of Lisinopril from the pill line without a sick call request. Instead, on January 2, 3, and 4, Plaintiff merely sought general medical services, for which he was required to submit a sick call request.

---

[11] As indicated in the recitation of material facts, the record is unclear as to whether Defendant Kellogg in fact provided Plaintiff a single daily dose of Lisinopril during the pre-hospitalization period, with Plaintiff stating she did and Defendant Kellogg stating she did not. *See supra* n.7. Also, the record is to some extent unclear as to whether Plaintiff was given a 30-day supply of Lisinopril on January 6, 2013, shortly before his hospitalization, which Plaintiff denies but contemporaneous medical records affirm. *See id.* More substantively, the record is silent as to whether that 30-day supply of Lisinopril was still available to Plaintiff upon his discharge from the hospital, excepting what conclusions may be drawn from the fact that Plaintiff undisputedly continued to request Lisinopril be provided to him.

[12] Defendant Kellogg also suggests that she did not know Plaintiff was trying to obtain his prescribed medication when he visited Medical Services, including because Plaintiff on two occasions did not "mention" that he was out of Lisinopril. *See* Defs.' Br. in Supp. at 21; Kellogg Aff. ¶¶ 4-5. The materials cited above create a genuine issue of material fact that Defendant Kellogg was aware that Plaintiff was attempting to obtain Lisinopril.

> . . . Rather than delaying or refusing to refill her gatekeeper role or denying access to medical care, Defendant Kellogg informed Plaintiff how to receive the medical care that he was seeking. It appears that Plaintiff's main concern was refilling his entire supply of keep on person medications, and ignored the availability of daily doses until that keep on person prescription was filled.

Defs.' Br. in Supp. at 21 (footnote omitted). This argument misunderstands Plaintiff's fundamental complaint. Plaintiff contends through sworn statements that Defendants Maker and Kellogg intentionally interfered with his prescribed treatment *because* they repeatedly insisted that Plaintiff fill out a sick call request *knowing none was required* for the type of treatment Plaintiff sought—i.e., to pick up the daily medication that his doctors had already prescribed to treat his high blood pressure. *See* Am. Compl. at 8-9; Pl.'s Aff. ¶ 1; Defs.' Summ. J. Ex. 6, at 2, 4-5.

Moreover, while the availability of Lisinopril to Plaintiff through another mechanism is certainly relevant to the seriousness of the health risk faced by Plaintiff and the appropriateness of Defendants' conduct in response to that risk, Defendants have not shown that to be the case for purposes of summary judgment. At no point do Defendants specifically allege or provide support for the assertions that Plaintiff personally could have obtained Lisinopril through the pill line, or that he was instructed to pick up daily doses of Lisinopril through the pill line. Defendants state that the pill line was located in the Medical Services unit, that both daily doses and "Keep on Person" supplies of medication were distributed from that line, and that inmates who went "to Medical Services asking specifically for prescribed medications [were] given their dose from the pill line, subject to confirmation from nurses that they ha[d] a current order," without

being "required to fill out sick call slips" before picking up medication at the pill line. Jones Aff. ¶¶ 4, 5, 6. This affidavit testimony does not by itself preclude—and indeed to some extent is consistent with—Plaintiff's contention that he properly requested his medication by presenting himself, as directed, to the Medical Services unit and asking for his "*prescribed* medication." Defs.' Summ. J. Ex. 6, at 5.

The suggestion that Plaintiff at any time could have obtained Lisinopril by using the pill line is also undermined by Plaintiff's evidence that on multiple occasions when he presented himself to the Medical Services unit he was instructed to leave (rather than being directed to the pill line). As detailed above, Plaintiff presents affidavit testimony by himself and another prisoner that Defendants Maker and Kellogg summarily and rudely denied Plaintiff's requests for Lisinopril. *See* Pl.'s Aff. ¶ 1; Goulsby Aff. ¶ 1; Defs.' Summ. J. Ex. 6, at 5. Whatever may be made of the tone of the responses to Plaintiff's requests, *see Gil v. Reed*, 381 F.3d 649, 660 (7th Cir. 2004) (observing that prison employees' crass responses to medical requests "could indicate that [they] had no legitimate reason for the refusal"), there is no indication in the summary judgment record that Plaintiff was informed that he could obtain Lisinopril in another way. *Cf. Martinez v. Garden*, 430 F.3d 1302, 1305 (10th Cir. 2005) (noting that the defendant prison officials' "failure to inform" plaintiff about his medical appointments supports a reasonable inference that the defendants were deliberately indifferent to the plaintiff's known medical condition). Plaintiff also presents evidentiary material indicating that beginning on January 10 he was denied access to the Medical Services unit, which would mean that he was denied access to the pill line during that time.

Defendant Kellogg has not shown through undisputed facts that her actions evidence only the proper fulfillment of a gatekeeper role, or that her requests that Plaintiff complete a sick call request did not preclude him from obtaining Lisinopril through the pill line. Thus, neither Defendant Kellogg's affidavit nor her appeal to Medical Services' general practice "necessarily forecloses the possibility," *Coit v. Zavaras*, 175 F. App'x 226, 229 (10th Cir. 2006), that she knowingly disregarded a substantial risk of serious harm to Plaintiff's health or safety when she denied him his prescribed medication.

These genuine issues of material fact preclude granting summary judgment in Defendant Kellogg's favor.

### Defendant Maker

Defendant Maker asserts arguments substantially similar to those of Defendant Kellogg, excepting that Defendant Maker does not contend that she was a mere gatekeeper for the provision of medical care by other health care professionals. *See* Defs.' Br. in Supp. at 22-25. These arguments fail for the same reasons as discussed above.

### Defendant Jones

Plaintiff's claim against Defendant Jones is based upon her alleged failure to ensure that Plaintiff received Drs. Wright and Baker's prescribed medication and follow-up care after Plaintiff was discharged from the hospital on January 9, 2013. *See* Am. Compl. at 9-10. Plaintiff alleges that Dr. Baker "forwarded [the discharge] instructions to" Defendant Jones and that it was her responsibly as CHSA to ensure that they were

followed.  *Id.*  When a deliberate indifference claim is based upon an official's supervisory responsibilities, liability must "be predicated on a violation traceable to a defendant-official's 'own individual actions.'"  *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 676).  "The plaintiff therefore must show an 'affirmative link' between the supervisor and the constitutional violation."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767-69 (10th Cir. 2013).  A plaintiff can "establish the defendant-supervisor's personal involvement" in her subordinates' unconstitutional conduct by demonstrating the supervisor's "failure to supervise" those subordinates.  *See Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (citing *Poolaw v. Marcantel*, 565 F.3d 721, 728 (10th Cir. 2009)).

The Court has held, in resolving Defendant Jones' motion to dismiss Plaintiff's supervisor-liability claim, that Plaintiff's allegations plausibly suggest that, "Ms. Jones, as the person receiving the discharge instructions on behalf of the facility and as the facility employee charged with ensuring access to medical care, had the affirmative obligation to ensure that the discharge instructions were followed."  *See* Order at 3.  Defendant Jones now argues that she is entitled to summary judgment because there is no genuine dispute that she "had no personal knowledge" of Plaintiff's discharge instructions, let alone that her staff failed to "compl[y] with" those instructions.  Defs.' Br. in Supp. at 19.  Put differently, Defendant Jones argues that she "could not" have been deliberately indifferent to Plaintiff's serious medical needs because she "did not know of the underlying facts indicating a sufficiently substantial danger," and was "therefore unaware of [the] danger," until after the underlying problem had been

resolved.  *See Farmer*, 511 U.S. at 844.  In support, Defendant Jones cites: (1) a copy of ODOC's policy governing "Outside Providers for Health Care Management," OP-140121, as it existed after July 23, 2014; and (2) Plaintiff's January 10, 2013 Request to Staff "asking for compliance with the discharge instructions," which Defendant Jones received on January 23, 2013.  *See* Defs.' Br. in Supp. at 18-19 (citing Defs.' Summ. J. Ex. 5, at 7).

First, Defendant Jones relies on a version of OP-0140121 that went into effect nearly eighteen months *after* the events at issue here.  *See id.*  That version of the policy has not been shown to be relevant to whether Defendant Jones was responsible for "deal[ing] with discharge instructions" in January 2013.  *See id.*

Second, the fact that Defendant Jones did not receive Plaintiff's January 10 Request to Staff, and its request for compliance with his hospital discharge instructions, until January 23 does not by itself preclude the possibility that Defendant Jones was actually aware of those instructions prior to that date.  As CHSA for DCCC, Defendant Jones' responsibilities in July 2013 included (1) "[c]oordinating the delivery of health care services to inmates"; (2) "coordinating the activities of employees in [the facility's] medical unit," including "doctors, registered nurses, licensed practical nurses, . . . and medical record technicians"; and (3) "ensuring that health records, reports, and other medical information conform[ed] to prescribed standards" and that "all required reports [were] submitted."  CHSA Job Description, Defs.' Summ. J. Ex. 3 (Doc. No. 50-3) at 1 (eff. July 15, 2013).  The Court has previously held that those responsibilities indicate that Defendant Jones should have known about the condition of Plaintiff and the actions

43

of DCCC staff during the relevant period. While that alone may not be enough to allow a supervisory liability claim to survive summary judgment, Defendant Jones also submitted an affidavit in which she states:

> The Health Service Staff at [DCCC] did comply with the orders of the Plaintiffs' doctors and post discharge instructions were followed.
>
> . . . .
>
> I did have personal knowledge of the Plaintiff[']s medical condition and did act according to DOC policy, and never exhibiting deliberate indifference to his serious medical need.

Jones Aff. ¶¶ 4, 6; *see* Fed. R. Civ. P. 56(c)(3). These statements reflect at least some level of actual knowledge of Plaintiff's condition and the actions of DCCC staff during the relevant period. Defendant Jones cannot both swear that her staff "compl[ied] with" and "followed" Drs. Wright and Baker's discharge instructions, Jones Aff. ¶ 4, and reasonably assert that she "had no personal knowledge" of those instructions before Plaintiff filed a Request "asking for compliance," Defs.' Br. in Supp. at 19.

Again, at issue here is Plaintiff's claim that Defendant Jones supervised the medical personnel who were supposed to be treating Plaintiff's hypertension after he suffered a stroke, and that she abdicated her duty to ensure her subordinates' compliance with Drs. Wright's and Baker's discharge instructions even though she "had been exposed to information concerning the risk" to Plaintiff's health if those instructions were not followed, *Farmer*, 511 U.S. at 842. *See* Order (Doc. No. 38) at 2-3. The summary judgment evidence put forward by Defendant Jones—i.e., the Request to Staff received by her on January 23, 2013, and the version of OP-140121 in effect in July 2014—does not "necessarily foreclose[] the possibility" that Defendant Jones was "deliberately

indifferent to [Plaintiff's] plight" after his discharge from the hospital and return to DCCC. *Coit*, 175 F. App'x at 229. Further, other evidence in the record, though largely circumstantial, indicates that Defendant Jones was or should have been aware of DCCC staff's failure to comply with Plaintiff's discharge instructions. Accordingly, Defendant Jones has not carried her burden of demonstrating that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law on Plaintiff's deliberate-indifference claim.

### D. Whether Defendants Maker and Kellogg Are Immune from Suit

The doctrine of qualified immunity protects individual government officials from civil lawsuits "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine is intended "to shield officials from harassment, distraction, and liability when they perform their duties reasonably," while ensuring that such officials who "exercise power irresponsibly" are held accountable. *Id.*

"When a defendant asserts qualified immunity [on] summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established" at that time. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). In determining whether the plaintiff has met this burden, the court views the facts and any reasonable inferences in the light most favorable to him as the nonmoving party. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009); *Mata*, 427 F.3d at 750. However, the "plaintiff's version of the

facts must find support in the record" if he or she is to defeat a qualified-immunity defense at this stage of litigation. *Thomson*, 584 F.3d at 1313. If the plaintiff satisfies the two-part initial burden described above, then the defendant "bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

Defendants Maker and Kellogg concede that Plaintiff "ha[d] a clearly established right to be free from deliberate indifference" in January 2013. *See* Defs.' Br. in Supp. at 31; *Gamble*, 429 U.S. at 104-05. The Supreme Court has further "explained that the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichel v. Howards*, 132 S. Ct. 2088, 2094 (2012) (citation and internal quotation marks omitted). The proper inquiry "is whether it would have been clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001). Thus, in January 2013, it would have been clear to a reasonable prison official that refusing a prisoner's repeated requests for his prescription medication—particularly while he reported physical symptoms consistent with a known underlying diagnosis—can constitute deliberate indifference to that prisoner's serious medical needs. *Purkey v. Green*, 28 F. App'x 736, 743 (10th Cir. 2001) (citing *Gamble*, 429 U.S. at 104-05); *see also Rutherford v. Med. Dep't of Dep't of Corr.*, 76 F. App'x 893, 902 (10th Cir. 2003); *Ledoux v. Davies*, 961 F.2d 1536, 1537-38

(10th Cir. 1992) ("[I]ntentional interference with prescribed treatment may constitute deliberate indifference.").

As detailed above, the summary judgment record supports a reasonable inference that, for the period prior to Plaintiff's hospitalization on January 6-9, 2013, Defendants Maker and Kellogg each knew that Plaintiff: (1) had been diagnosed with high blood pressure; (2) took a prescription medication every day; (3) suddenly lost his personal supply of that medication; (4) asked to be given the medication at least twice and possibly four days in a row; and (5) reported experiencing increasingly worsening "blurred vision, dizziness, severe headaches[,] and an overall sickly feeling." It is also reasonable to infer that, for the period after Plaintiff's discharge from the hospital on January 9, 2013, each Defendant knew that Plaintiff: (1) had been hospitalized and was recently released; (2) complained of chest pain; (3) asked to have his blood pressure checked; and (4) sought to obtain medication prescribed to him upon his discharge from the hospital. Upon consideration of these facts, and the remaining undisputed facts and inferences set forth above, Plaintiff has met his initial burden to "show (1) a reasonable jury could find facts supporting a violation of a constitutional right [that] (2) was clearly established at the time of the defendant's conduct." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citing *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)); *see also Mata*, 427 F.3d at 752 (holding that plaintiff asserting Eighth Amendment claim based on delay of care can defeat qualified immunity on summary judgment by demonstrating that his or her "medical need was objectively sufficiently serious," that "defendant's delay in

meeting that need caused [him] substantial harm," and that "defendants knew about and disregarded a substantial risk of harm" to Plaintiff's health or safety).

Asserting arguments largely derivative of those addressed above, Defendants Maker and Kellogg nonetheless argue that they are entitled to qualified immunity because "[t]he undisputed facts show that [they] were not deliberately indifferent, and therefore did not violate Plaintiff's clearly established rights." Defs.' Br. in Supp. at 31. For substantially the same reasons as previously detailed, the undersigned disagrees.[13]

First, relying on the facts and inferences set forth above, a reasonable jury could conclude that Plaintiff's medical needs were "sufficiently serious" during the relevant time period to support the objective component of an Eighth Amendment claim. With respect to the pre-hospitalization period, Defendants do not dispute that Plaintiff's hypertension had been diagnosed by a physician as mandating daily prescription medication before Plaintiff suddenly lost his personal supply of Lisinopril on December 31, 2012. *See* Defs.' Br. in Supp. at 7. Both parties also produced evidence that Plaintiff's Lisinopril was not replaced before he suffered a stroke (or a transient ischemic

---

[13] In their brief, Defendants note that they "did refill Plaintiff's medication" and "provided him with that medication." Defs.' Br. in Supp. at 31. Defendants do not explain this assertion, which stands in contrast to their acknowledgment elsewhere that they failed to provide Plaintiff his prescribed medication for multiple days prior to his hospitalization and for 13 days after his discharge. To the extent Defendants refer to Nurse Sutton giving Plaintiff Lisinopril on January 22, 2013, that fact would not by itself establish that neither Defendant Maker nor Kellogg knowingly disregarded a substantial risk of serious harm to Plaintiff's health. *See Mata*, 427 F.3d at 756; *cf. Estate of Booker*, 745 F.3d at 433 ("Because deliberate indifference is assessed at the time of the alleged omission, the Defendants' eventual provision of medical care does not insulate them from liability."). Other possible instances of Nurse Sutton giving Plaintiff Lisinopril are the subject of disputed facts, as detailed above. *See supra* n. 7.

attack) on January 6, 2013. *See, e.g.*, S.R. Ex. 22, at 107. To the extent Plaintiff seeks to recover for "harm caused by a delay in medical treatment," *Al-Turki*, 762 F.3d at 1193, the record contains evidence supporting a reasonable inference that Defendants' initial delay in replacing his Lisinopril caused Plaintiff to suffer this life-threatening medical event. S.R. Ex. 26, at 122-23; Sutton Aff. ¶ 3. This is sufficient to preclude summary judgment. *See Mata*, 427 F.3d at 751; *see also Childress v. Harms*, 449 F. App'x 758, 760-61 (10th Cir. 2011) (noting defendant's concession that a cerebellar stroke satisfied the deliberate-indifference test's objective component). With respect to the post-hospitalization period, the summary judgment record likewise precludes a finding that the objective component of Plaintiff's Eighth Amendment claim cannot be met, for the reasons detailed above.

Next, and again as discussed above, the summary judgment record would allow a reasonable jury to conclude that Defendants Maker and Kellogg knew of the risk to Plaintiff's health caused by a delay in medication, based on either their medical training or the risk's obviousness. Both Defendants were "very familiar" with Plaintiff and his "prescribed medication" in January 2013 because Plaintiff had been their "patient since 2009." Pl.'s Aff. ¶ 1. Plaintiff specifically had taken prescription Lisinopril for high blood pressure since November 2010. *See* Defs.' Br. in Supp. at 7.

Further, the summary judgment record provides enough information about what Plaintiff said to Defendants Maker and Kellogg, and how often he said it, for a reasonable jury to conclude that each Defendant "had been exposed to information concerning the risk and [therefore] must have known about it," *Farmer*, 511 U.S. at 842 (internal

quotation marks omitted), when she refused Plaintiff's requests. *Compare Mata*, 427 F.3d at 756 (holding that prison nurse was not entitled to qualified immunity against plaintiff's deliberate-indifference claim in part because plaintiff "personally reported" to defendant that she "was suffering from severe chest pains and required medical attention"), *with Stafford v. Stewart*, 461 F. App'x 767, 770 (10th Cir. 2012) (holding that prison employee was entitled to qualified immunity against plaintiff's deliberate-indifference claim where plaintiff proffered no evidence of "what she said to [defendant] or how often she asked [defendant] to see a nurse"). For example, Plaintiff told Defendants Maker and Kellogg at least four times that he needed his "prescribed medications" and was suffering from blurry vision, dizziness, headaches, and malaise that got "increasingly worse" over the course of the week. At least twice, Plaintiff asked Defendants Maker and Kellogg to provide his prescribed medication on an "emergency basis" because he lost his own supply when his housing unit flooded. *See* Am. Compl. at 8; Pl.'s Aff. ¶ 1; Defs.' Summ. J. Ex. 6, at 2, 5. On one occasion, Plaintiff asked for his prescribed medication while also complaining of chest pain. *See* Def.'s Summ. J. Ex. 6, at 2, 5; S.R. Ex. 27, at 143.

Finally, whether each Defendant refused Plaintiff's requests knowing that doing so would pose a substantial risk of serious harm to Plaintiff's health or safety "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Defendants' professional knowledge of Plaintiff's medical condition, coupled with their inferred refusal to administer Plaintiff's medication in accordance with his physician's orders, allows a reasonable

conclusion that Defendants were aware that their conduct posed a substantial risk of serious harm to Plaintiff's health.  *See, e.g., Purkey*, 28 F. App'x at 743; *cf. Martinez*, 430 F.3d at 1305  ("Knowledge of [plaintiff's] medical condition, coupled with the alleged failure to inform him of medical appointments or to arrange transportation, may give rise to an inference that defendants acted with deliberate indifference.").

Accordingly, the undersigned finds that Defendants Maker and Kellogg are not entitled to qualified immunity against Plaintiff's deliberate-indifference claims.

### III.    *Whether Plaintiff Is Entitled to Summary Judgment Against Any Defendant*

Plaintiff has also moved for summary judgment on his deliberate-indifference claims against each Defendant.  *See* Pl.'s Mot. Summ. J. & Br. in Supp. (Doc. No. 52). As noted, Plaintiff bears the ultimate burden of proving that each Defendant was deliberately indifferent to Plaintiff's serious medical needs when they allegedly interfered with his prescribed treatment.  Thus, to prevail on his motion for summary judgment, Plaintiff also bears the initial burden of producing evidence establishing all elements of his claim against a particular Defendant.  *Pelt*, 539 F.3d at 1280; *see also Leone*, 810 F.3d at 1153.

The fact that genuine disputes of material fact prevent granting judgment as a matter of law in favor of Defendants does not mean that Plaintiff is entitled to judgment in his favor on those same claims.  *See Buell Cabinet Co.*, 608 F.2d at 433 ("Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").  In considering Defendants' motions, the Court views the facts and any reasonable inferences in *Plaintiff's* favor and asks whether a reasonable

juror *could* conclude that Defendants Maker and Kellogg knowingly disregarded a substantial risk of serious harm to Plaintiff's health. *See, e.g.*, *Mata*, 427 F.3d at 750. In considering Plaintiff's motion, the question becomes whether, viewing the facts and any reasonable inferences in *Defendants'* favor, a reasonable jury *must* conclude that each Defendant did the same. *See Leone*, 810 F.3d at 1153-54. "In other words, the evidence in [Plaintiff's] favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 *Moore's Federal Practice* § 56.40(c)(1) (3d ed. 2015)).

Plaintiff's brief essentially reurges the allegations made in his Amended Complaint, which this Court has determined are sufficient to state a claim for relief against each Defendant. *See generally* Pl.'s Br. in Supp. at 3-10 (citing Am. Compl. at 8-10; Order at 2-5; R. & R. Defs.' Disp. Mot. at 20-23). Such sworn allegations, even if acceptable under Rule 56(c) to defeat summary judgment, are not sufficient to establish that there is no genuine dispute as to any material fact or that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). Those statements and the other materials cited by Plaintiff create questions of fact to be decided by a jury and nothing else.

## IV. *Whether Plaintiff Is Entitled to Relief Under Rule 50(a)*

Plaintiff has also filed a "Motion for Directed Verdict" in which he asserts that he is entitled to judgment because he has established "deliberate indifference to medical treatment" and Defendants "have not justified, nor provided penological reason why the Plaintiff was denied his high blood pressure medication which ultimately led to the Plaintiff suffering a stroke." Pl.'s Mot. (Doc. No. 64) at 1. The Federal Rules of Civil

Procedure no longer recognize motions for directed verdicts. *See Jenkins v. Educ. Credit Mgmt. Corp.*, 212 F. App'x 729, 733 (10th Cir. 2007). Rather, such requests are properly viewed as motions for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. *See id.* at 733-34. Rule 50(a) allows the court to resolve an issue against a party after the "party has been fully heard on [the] issue *during a jury trial* and the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on that issue." Fed. R. Civ. P. 50(a) (emphasis added). No jury trial having been had, Plaintiff's motion is premature and should be denied without prejudice.

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that Defendants' Motion for Summary Judgment (Doc. No. 50), Plaintiff's Motion for Summary Judgment (Doc. No. 52), and Plaintiff's "Motion for Directed Verdict" (Doc. No. 64) be denied in their entireties.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of the right to file an objection to this Report and Recommendation with the Clerk of this Court by April 7, 2016, in accordance with 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. The parties are further advised that failure to timely object to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the present case.

ENTERED this 17th day of March, 2016.

_____
CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE